THIRD DIVISION

September 28, 2001

No. 1-99-1750

  

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) 

)

GABRIEL BEDOYA, ) Honorable

) Lon William Schultz,

Defendant-Appellant. ) Judge Presiding.

     JUSTICE WOLFSON delivered the opinion of the court:

     The State presented seven witnesses and 27 exhibits to support its claim that Gabriel Bedoya fired a gun from a car at three Chicago buildings in the early morning hours of May 27, 1994.  Bedoya was not on trial for firing those gunshots.  He was charged with murdering Jose Rodriguez during a struggle at a tavern a short time later.  A jury found him guilty of first degree murder.  Introduction of the other offense evidence was a contested issue at trial and is at the center of this appeal.  We reverse Bedoya's conviction and remand this cause for a new trial.

FACTS

     On May 27, 1994, defendant, a Milwaukee police officer, shot and killed Jose Julian Rodriguez (Rodriguez), a bouncer at a Chicago bar.  Defendant fled to Milwaukee, where he was taken into custody.  There were two trials.

     In the first trial, defendant was charged with first degree murder, but also was indicted for a number of shootings that occurred earlier in the evening.  The State alleged defendant fired his gun at several buildings in Chicago's Gold Coast neighborhood before he ended his evening at the club where the victim was killed.  The State claimed defendant shot at the Claridge Hotel, the Ambassador Hotel, and at Cardinal Bernadin's residence.  He was charged with four counts of aggravated discharge of a firearm.  

     A jury found defendant not guilty of aggravated discharge of a firearm, but convicted him of first degree murder despite his claim that he killed the victim in self-defense.  We reversed and remanded the case 
because the trial court did not allow defendant to introduce evidence of the victim's prior violent acts.  
People v. Bedoya
, 288 Ill. App. 3d 226, 681 N.E. 2d 19 (1997).

     Before the second trial the court made two rulings that form the serious issues on appeal.  First, the trial court, over defense objection, said it would allow the jury to hear evidence of the prior shootings.  It would come in as other offense evidence, relevant to the defendant's mental state at the time the fatal shot was fired.  Second, the defense would be precluded from telling the jury Bedoya had been acquitted of the aggravated discharge of a firearm charges.  

     The trial began.

     Chicago police investigator Lloyd Jones testified he was a patrol officer in May 1994.  In the early morning of May 27, 1994, Jones and his partner responded to a report of "shots fired" at the Claridge Hotel.  When he got to the hotel, Jones noticed one of the picture windows in the front of the building had a hole in it.  The hotel's security guard told the officers a gun shot had been fired through the glass plate window.  The bullet struck a chair in the front lobby area of the hotel.  Jones said he found a spent bullet round on the floor next to the chair.  The officer also found an empty .40 caliber shell casing on the curb in front of the hotel.  The hotel was open when the shots were fired.

     Jones said they later recovered another .40 caliber shell casing from the sidewalk across the street from the hotel.  A resident of the neighborhood contacted the police department after she found the casing.  The State asked Jones to identify a series of photographs showing the damage to the window of the Claridge hotel and the chair in the lobby.  Jones was asked to identify a picture of the shell casing that was on the floor next to the chair.

     Chicago police officer Gerald Breiman was on patrol on May 27, 1994, when he and his partner responded to a radio call of "shots fired."  They went to the Claridge Hotel and were told that shots had been fired at the hotel.  Breiman and his partner drove around the neighborhood in an attempt to find the shooter's car.  As they were driving, a doorman at the Ambassador Hotel flagged them down.  The doorman told Breiman he was sitting at his desk when he heard four or five gun shots.  When he walked outside to see what had happened, he saw a bullet hole in the front window of the Ambassador Hotel.  

     Officer Breiman testified he saw one bullet hole in the front window of the Ambassador Hotel.  The officer went inside the hotel and saw an area on a brick wall that the bullet appeared to have hit.  He saw what he believed to be a bullet fragment on the floor by the brick wall.  The State asked Officer Breiman to identify a number of pictures documenting the damage to the window and the area where the bullet fragment was found.

     Chicago police sergeant James Sims testified he was a field training officer in May 1994.  On May 27, 1994, he was assigned to a call of "shots fired" at a high rise residential building on North Astor Street.  Sergeant Sims said the building's doorman heard the shots but thought they were fired across the street.  Cardinal Bernadin's mansion was directly across the street from the high rise.  Sergeant Sims did not find any evidence that there were gunshots at the high rise building.  He walked across the street to the Cardinal's residence and spoke with the officer who was assigned to the residence that night.

     Sergeant Sims and the other officer walked around the residence looking for evidence of gun shots.  At one of the entrances, Sims found bullet holes on the woodwork inside the vestibule as well as four bullet holes in the door itself.  The State asked Sims to identify several pictures showing the damage to the house.

     Chicago police officer Raymond Trezise testified he was an evidence technician in May 1994.  Trezise was responsible for photographing crime scenes and collecting evidence.  Trezise testified he was assigned to collect evidence at the Cardinal's residence on May 27, 1994.  Trezise photographed the crime scene and inventoried evidence.  The evidence consisted of one fired bullet and five bullet fragments.  The bullet and fragments were recovered from inside a door to the house and on the steps leading to the door.  Trezise testified he did not find any bullet casings.  The State asked Trezise to identify a number of photos he took of the damage to the Cardinal's residence.  Trezise was asked to identify the bullet and fragments he recovered.  

     Trezise testified he also was assigned to recover evidence from the Ambassador Hotel.  Trezise photographed the bullet hole in the front window and recovered a bullet fragment from the lobby.  Trezise said he recovered several bullet casings from the sidewalk in front of the hotel.  Trezise was asked to identify several photographs of the damage to the hotel.

     Trezise testified he recovered evidence from the Claridge Hotel on the same night.  Trezise looked for damage and photographed the scene.  He recovered a spent bullet from the lobby of the hotel and a bullet casing another police officer found on the sidewalk.  Trezise again identified a series of photographs of the damage to the hotel and the bullet casing and fragments he recovered.  

     John Koch testified he was a police officer for the Milwaukee police department in May 1994.  Koch said he was dismissed from the department after pleading guilty to aggravated discharge of a firearm, obstructing justice, and aiding a fugitive.  These charges were brought against him in connection with the shootings at the Claridge Hotel, the Ambassador Hotel, and the Cardinal's residence, as well as for Koch's actions following Rodriguez' death.  Koch agreed to testify against defendant in exchange for a sentence of three years' probation.  Koch said he pled guilty to aggravated discharge of a firearm because "[he] failed to take the appropriate actions when [he] witnessed a crime."  

     Koch admitted he also had been convicted of criminal damage to property in relation to a domestic dispute with an ex-wife.  He also was convicted for failure to pay child support.  

     Koch testified defendant was his roommate in May 1994.  Defendant's girlfriend and her two children were also living at the condominium.  On May 26, 1994, defendant and Koch made plans to go out that evening.  They decided to go to Chicago.  Koch said they planned on staying in Chicago overnight.  Defendant and Koch were drinking gin and tonic before they left for Chicago. 

     Koch said he and defendant were both wearing their weapons that night, though they were off-duty.  Both weapons were .40 caliber semi-automatic handguns issued by the Milwaukee police department.  Koch and defendant left Milwaukee at about 8:30 p.m.  They were in Koch's car, a 1990 Toyota Camry.  After they crossed the state line, Koch stopped at a gas station and bought a six-pack of beer.  They drank the beer during the drive to Chicago.  

     Koch and defendant arrived in Chicago at around 10:30 p.m. and went to a night club called "Cassanova."  Defendant told Koch how to get to the club.  Koch said he and defendant each had two drinks at Cassanova.  Defendant told Koch the night club was owned by a relative.  Koch said he and defendant went to a club called "Dynasty" after they left Cassanova.  Koch allowed defendant to drive because he wasn't familiar with the bar's location.  

     Koch testified defendant told him to expect the bouncer at Dynasty to frisk them as they entered the club.  Koch said defendant told him not to worry about being frisked because he would tell the bouncer that they were police officers.  When they got to the bar, the bouncer did not frisk them, but defendant identified himself as a police officer.  Defendant opened his jacket and showed the bouncer his gun and his badge.  When they got inside the bar, defendant saw someone he knew.  Koch said the person was an off-duty Chicago police officer.  The officer suggested the men go to another bar called "Mother's."  Koch and defendant left Dynasty and defendant drove to Mother's.  During the drive, Koch took his gun off and put it inside the glove compartment.  

     Koch and defendant arrived at Mother's.  They parked about a block from the bar.  Koch and defendant ordered drinks and Koch began to dance with another patron.  Koch had another drink before he and defendant left the bar.  

     While Koch was walking to the car he heard a loud noise.  Koch looked up and saw defendant with his gun out.  Defendant was aiming his gun at a 45-degree angle toward the ground.  Koch testified he asked defendant what he was doing.  Defendant told him, "This is the city, we're not gonna get caught."

     Once they got back to the car, defendant drove.  Koch said he was "nodding off" while defendant was driving.  Koch awoke to the sound of more gunfire.  Koch said defendant was leaning on him, shooting out of the passenger side window at a building.  Koch testified defendant's arm was directly across his chest, with the barrel of the gun pointed out the window.  Koch again asked defendant what he was doing.  Defendant responded, "I just hit a lobby."

     Koch testified defendant continued to drive and shot at another building.  Defendant then drove back to Dynasty.  He parked the car directly in front of the club.  Koch said the men did not encounter a bouncer when they entered the club.  Koch and defendant had another drink.  As Koch finished his drink, he noticed defendant walk out the door.  Koch followed defendant.  When he got outside, Koch said he saw defendant struggling with Rodriguez.  The men were arguing in Spanish.  Koch does not speak Spanish and could not understand what the men were arguing about.

     Koch walked behind Rodriguez and tried to grab his arms because he wanted to stop the altercation.  Rodriguez shrugged Koch off and Koch stumbled backward.  At that point, Koch heard a loud noise that sounded like a gunshot.  Koch said Rodriguez made a "strange sound" and uttered a sentence in Spanish.  Rodriguez relaxed his grip on defendant, turned around and walked toward the bar.  Koch testified defendant was holding his gun in his right hand.  Defendant put his gun back in his holster and started to walk away.  Koch said he heard defendant say, "I shot the motherfucker."

     Koch testified he and defendant walked to a corner, turned, and walked another half a block.  Defendant told Koch to get in the car and meet him around the corner.  Koch said he walked back to where the car was parked.  As he was getting into the car, Koch saw emergency lights and heard sirens coming in his direction.  Koch got into the car and picked up defendant.  They drove about half a block when defendant told Koch to pull over and allow him to drive.  

     Koch remembered stopping at another location after that, but couldn't remember where it was.  The next thing Koch remembered was waking up in the car the next morning.  The car was parked at his condominium.  Defendant was in the driver's seat.  Both doors were open and the Milwaukee police were around the car.  The police woke Koch up and put him in the back of one of the unmarked squad cars.  Koch said he found that he had vomited and urinated on himself.

     Before Koch was taken to the police station, the officers asked him where his gun was.  Koch told them it was in the glove compartment of the car.  

     During cross-examination, defense counsel asked if he fired the gun during the shootings at the Claridge Hotel, the Ambassador Hotel, and the Cardinal's residence.  He said he did not.  Counsel asked why he pled guilty to the charges of aggravated discharge.  Koch testified he plead guilty "by accountability."  The State objected to the line of questioning and the court sustained the objection and told counsel not to "get into the legal issues of accountability."  Koch also testified that while his license plate was on the back of his car when he and defendant left for Chicago, it was removed at some point.  Koch said he did not know when it was removed.

     Miguel Lopez testified he worked at Dynasty as a bartender in May 1994.  Lopez could see shadows and movement through a glass wall that separated the bar from the vestibule leading into the bar.  Lopez said Rodriguez was working as a bouncer in May 1994.  Rodriguez started work at around 9 or 10 p.m. on May 26, 1994.  

     Lopez said he saw defendant and Koch enter Dynasty at around 1 or 1:30 in the morning and said they stayed for about 10 or 15 minutes.  Lopez saw the men enter the bar again at about 2 a.m.  They stayed for 10 or 15 minutes, then walked toward the exit door.  As they were walking toward the exit, Lopez realized a glass was missing from the bar.  Lopez looked out the glass wall and saw Rodriguez outside on the sidewalk.  Lopez said he walked out onto the sidewalk and saw defendant, Koch, and Rodriguez.  They were involved in some kind of struggle and defendant had a gun in his hand.  

     Lopez went back into the bar and told the DJ to call the police because Rodriguez was having problems with a patron.  Lopez went back to the front door.  Before he got to the door, Lopez heard a gunshot.  When Lopez tried to push the front door open, he realized he couldn't because Rodriguez' body was blocking the door.  

     Maxim Taylor testified he was a sergeant with the Milwaukee police department in May 1994.  On May 27, 1994, he was told a shooting occurred in Chicago and the Chicago police were looking for a suspect they believed was a Milwaukee police officer. After he was told they were looking for defendant, Taylor looked up defendant's address and phone number.  Taylor found the address and he and several other officers drove there.  Taylor said defendant and Koch were not home when he and the other officers arrived.  As they were getting ready to leave, Taylor saw defendant drive into the parking lot.  Taylor got out of his car and approached defendant.  He asked defendant where his gun was and conducted a pat-down search of him.  Defendant asked Taylor why he was being searched and Taylor told him it was in relation to a shooting in Chicago.  Defendant told Taylor his gun was under the driver's seat.  The officer retrieved the gun.

     Taylor woke Koch, who was asleep in the passenger's seat.  Taylor testified Koch had vomited and urinated on himself.  Koch told Taylor his gun was in the glove compartment.  Defendant and Koch were taken to the Milwaukee police department.  

     Taylor examined defendant's gun after he recovered it from the car.  The gun had a lot of carbon build-up in the ramp that leads to the gun's barrel, indicating it had been fired.  It smelled of gunpowder.  Taylor noticed a spent shell casing in the passenger seat of the car and saw a bullet hole in the passenger side door.  Taylor testified the bullet hole looked as though someone in the driver's seat reached over and fired a bullet through the door.  

     Richard Fournier testified he was a firearms examiner for the Chicago police department in May 1994.  Fournier examined defendant's gun and Koch's gun, as well as the bullets and cartridge cases recovered from the Claridge Hotel, the Ambassador Hotel, the Cardinal's residence, and the Dynasty Club.  Some of the bullets and fragments could not be compared to the guns because of their condition.  

     The cartridge casings recovered from the Claridge Hotel and the Ambassador Hotel matched defendant's gun.  Fournier was able to determine that several of the cartridges recovered from the Cardinal's residence matched defendant's gun.  While Fournier was not able to match the bullet recovered from the Dynasty Club to either gun, he determined that the cartridge case recovered from the club matched defendant's gun.  The casings found in Koch's car also matched defendant's gun.  

     Dr. Nancy Jones testified she worked for the Cook County medical examiner as a forensic pathologist.  Dr. Jones performed the autopsy on Rodriguez' body.  Dr. Jones said Rodriguez had a gunshot wound on his left chest and an exit wound on his back.  There were some "blunt trauma injuries" that included a cut on Rodriguez' forehead.  Rodriguez also had several scratches on his mouth.  Dr. Jones testified that in order for the bullet to have taken the course it took through Rodriguez' body, the gun would have had to have been nearly touching his chest.  Dr. Jones tested Rodriguez' blood for drugs and alcohol and found he had consumed up to two drinks before he died and that he had metabolites of cocaine in his system.  

     The parties stipulated Sandy Peterson would testify she found a shell casing in the area of 1223 North Dearborn, across from the Claridge Hotel.  She notified the police.  

     The parties stipulated Chicago police detective Al Schoessow would testify he recovered a .40 caliber Glock handgun from underneath the driver's seat of Koch's car.  The magazine was in the gun.  There was no bullet in the chamber.  The handgun was inside a Milwaukee police department holster.  The detective would also testify he recovered another .40 caliber Glock handgun from the glove compartment of Koch's car.  It was also in a Milwaukee police department holster.  The magazine was in the gun.  There was one bullet in the chamber.  

     The parties stipulated Detective Schoessow would say he saw a bullet hole in the passenger door of Koch's car, near the armrest.  The detective would say he found a .40 caliber casing on the passenger seat and another .40 caliber casing on the floor in the passenger area of Koch's car.  Three bullet fragments were recovered from the passenger side door.

     Chicago police detective Ronald Yawger testified he was assigned to investigate a shooting at the Dynasty Club on May 27, 1994.  When he arrived at the club, Rodriguez' body was lying in the vestibule area of the doorway.  Rodriguez' feet were protruding outside the door onto the sidewalk.  Rodriguez had a gunshot wound to his chest with an exit wound in the middle of his back.  Yawger saw a .40 caliber shell casing lying in the street between the curb and the tire of a car.  The casing was recovered.

     When the detective returned to the police station, he spoke to an evidence technician who told him there had been three separate shooting incidents in the area and that .40 caliber casings were recovered from each scene.  Yawger said .40 caliber ammunition was unusual in 1994.

     Detective Yawger went to Milwaukee.  The bartender from Dynasty went with him to view a lineup.  The bartender identified defendant from the lineup.  

     That, in essence, was the State's case.

     In his defense, Bedoya called Beatrice Rodriguez and four Cicero police officers.  They all testified to a "domestic incident" of May 21, 1992.  Beatrice and Jose Rodriguez had been fighting.  He had hit her with a closed fist.  The police were called.  When they tried to arrest Rodriguez he pointed a gun at them and threatened to kill them.  Finally, after some resistance, they took Rodriguez into custody.  He had a loaded gun.  The testimony was admitted to prove Rodriguez' violent character on the day he was killed.

     The defendant testified.  He said he was living in Milwaukee in May 1994.  He was an officer with the Milwaukee police department and was living with Koch, who was his partner.  Defendant's girlfriend and her children also were living with him.  On May 26, 1994, Koch came home from work around 8:00 a.m.  Defendant said he saw Koch drink a glass of wine and a beer that day.   

     Defendant testified he and Koch drove to Chicago on May 26, 1994.  At some point, Koch stopped at a gas station to get gas.  Defendant said he went to the restroom.  When they got back into the car, Koch continued to drive.  Defendant testified Koch must have bought beer at the gas station, because when he got back in the car Koch asked defendant to hand him a beer from a six-pack that was in the back seat.  

     When they got to Chicago, they drove around in a neighborhood defendant said many city workers and police officers lived in.  Defendant then directed Koch to the Cassanova night club.  Defendant testified his uncle owned the club.  Defendant and Koch each ordered a gin and tonic and defendant showed Koch around the club.  

     Defendant said he and Koch left to go to Dynasty, a Columbian night club north of Cassanova.  They went into Dynasty and ordered another gin and tonic.  Both defendant and Koch were carrying the guns issued to them by the Milwaukee police department.  Defendant said it was not unusual for them to carry their guns when they were off-duty.  Later, defendant and Koch went to another bar, "Mother's," on Division Street.  

     At Mother's, Koch started dancing with two women who were on the dance floor.  According to defendant, both women sat down.  Koch ordered three drinks, ignoring the drink he had ordered earlier, and took them over to the women.  Defendant said the women refused the drinks and left.  Koch drank all three of the drinks.  Defendant and Koch started to leave.  Defendant said Koch tried to talk to two more women on their way out.  A man walked over to the women and told Koch the women were with him.  Koch and defendant left the bar.  

     Defendant testified he never took his gun out during the walk to the car.  When they got to the car, defendant opened the passenger side door for Koch.  Defendant got in the driver's seat and removed his gun holster.  Defendant said he placed the holster on the console next to his side.  Defendant testified Koch was mumbling "why can't I get a woman" and was somewhat belligerent.  Defendant started to drive and heard a gunshot from the right side.  He looked over and saw Koch with a gun in his hand.  Defendant testified Koch was firing the gun out the open passenger side window of the car.  

     Defendant said he continued to drive.  Defendant heard more shots and "panicked" when he realized Koch had two guns – - his own and defendant's.  As Koch was firing the gun, defendant hit Koch's hand and brought it inside the car.  Defendant said the gun fired one more time inside the car before defendant threw the gun on the floor of the car.  According to defendant, Koch was yelling profanities and the names of his ex-wives as he shot the gun.

     Defendant testified Koch passed out.  Defendant removed Koch's gun from Koch's belt and threw it into the car's glove compartment.  Defendant said he realized he would have to report to the Milwaukee police department that his gun had been fired.  He drove back to Dynasty.  The men went inside the club and defendant ordered two more drinks.  Defendant testified Koch started to walk outside just as the bartender gave them their drinks.  Defendant followed him.

     Defendant testified as he went out the door, Rodriguez "aggressively" grabbed his left shoulder and said "police shit."  Defendant said Rodriguez lifted him up on his toes and reached for defendant's gun.  Defendant testified he tried to push down on his gun with his right hand to keep Rodriguez from getting the gun out of the holster.  Defendant said Rodriguez kicked him in the groin.  At that point, they were out on the sidewalk in front of the club.  

     Defendant said Rodriguez had defendant's gun and was swinging it in defendant's face.  Defendant testified he grabbed the barrel of the gun and struggled with Rodriguez.  Koch came up behind Rodriguez and tried to grab him, but Rodriguez shook him off.  Defendant said the gun discharged and Rodriguez turned around and walked toward the door of the club.  Defendant said he did not realize Rodriguez had been shot.  Defendant testified he thought Rodriguez was going to kill him when he grabbed defendant's gun.

     After the gun went off and Rodriguez walked away, defendant said he called out to Koch.  Koch answered and defendant "followed his voice" to a driveway next to the building.  Defendant testified he never said "I shot the motherfucker" or gave Koch the keys to the car and asked him to meet around the corner.  Defendant said after his gun discharged and he realized he and Koch were not hurt, his only concern was to "get out of there."  Defendant said he was "scared" because "of everything that happened that night."  Defendant testified he returned to Cassanova, his uncle's night club.  Defendant said they only stayed at Cassanova's a few minutes before they left to drive back to Milwaukee.

     First, defendant pulled into a "Denny's" parking lot, where he stayed for a couple of hours after falling asleep in the car.  When he woke up, defendant picked up the bullet casings from the floor of the car, emptied the bullets from his gun, and tossed all of the bullets and casings into an abandoned car.  Defendant drove back to Milwaukee.  He said he never removed the rear license plate from Koch's car.  

     Defendant testified he never fired the gun at Rodriguez.  He said Rodriguez pulled the trigger during their struggle.

     After final arguments the jury retired to deliberate.  Because of a question sent out by the jury - - "Is there a murder charge less than first degree murder but more than involuntary manslaughter available?" – - the defendant was given an opportunity to have the jury instructed on second degree murder.  Bedoya said he did not want the instruction.  It was not given.  

     The jury found defendant guilty of first degree murder and the trial court sentenced him to 30 years in prison.

DECISION

Other Offenses Evidence

     Few evidentiary issues receive as much reviewing court attention as the use of other offense evidence in criminal cases.  While the principles of law that apply to other offense evidence are easy to find and summarize, their application in a particular case, being fact-intensive, is a different matter.

     Other offense evidence is admissible if it is relevant for any purpose other than to show the defendant's disposition or propensity to commit crime.  
People v. McKibbins
, 96 Ill. 2d 176,

182, 449 N.E.2d 821 (1983).  Examples of relevant purpose include 
modus
 
operandi
, intent, identity, motive, or absence of mistake.  
People v. McKibbins
, 96 Ill. 2d at 182.  The list is not

exclusive. 

     Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence.  
People v. Green
, 322 Ill. App. 3d 747, 757, 751 N.E. 2d 10 (2001).

     When the trial court finds some relevance in the other offense evidence, it must then conduct a balancing test.  Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  
People v. Stewart
, 105 Ill. 2d 22, 62, 473 N.E.2d 840 (1984).   

     The danger of presenting evidence to establish the defendant's propensity to commit a crime is that it "overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment."  
People v. Lindgren
, 79 Ill. 2d 129, 137, 402 N.E.2d 238 (1980).

     The erroneous admission of other offense evidence "carries a high risk of prejudice and ordinarily calls for reversal."  
People v. Lindgren
, 79 Ill. 2d at 140.  The admissibility of other offense evidence rests within the sound discretion of the trial court and will not be overturned absent a clear abuse of discretion.  
People v. Placek
, 184 Ill. 2d 370, 385, 704 N.E. 2d 393 (1998).

     The standard for admissibility of other crimes evidence has not been clearly established in Illinois.  It is more than mere suspicion, but less than beyond a reasonable doubt.  See Graham, Handbook of Illinois Evidence, § 404.5 at 241 (7th ed. 1999).  The United States Supreme Court has said other offense evidence is admissible when the jury could reasonably find by a preponderance of the evidence that the defendant committed the other offense.  
Huddleston v. United States
, 485 U.S. 681, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988).

     Even when admitted, the other offense evidence must not become a focal point of the trial.  
People v. Thigpen
, 306 Ill. App.  3d 29, 37, 713 N.E. 2d 633 (1999).  That is, the trial court should not permit a "mini-trial" of the other, uncharged offense, but should allow only that which is necessary to "illuminate the issue for which the other crime was introduced."  
People v. Nunley
,  271 Ill. App. 3d 427, 432, 648 N.E. 2d 1015 (1995).

     In order to breach the relevancy barrier the proponent of  the other offense evidence must show similarity to the offense being tried.  That is,

"Evidence of another crime, however, may be used only when the other crime has some threshold similarity to the crime charged.  It is this similarity which increases the relevance of the evidence and ensures that it is not being used solely to

establish the defendant's criminal propensities."  
People v. Bartall
, 98 Ill. 2d 294, 310, 456 N.E. 2d 59 (1983).

     While the degree of similarity required may vary, depending on the relevant purpose of the evidence, "mere general areas of similarity will suffice" when offered to prove the absence of an

innocent frame of mind or the presence of criminal intent.  
People v McKibbins
, 96 Ill. 2d at 185-86.  The test is not one of exact, rigorous identity, and some dissimilarity will always

exist between independent crimes.  
People v. Robinson
, 167 Ill. 2d 53, 65, 656 N.E. 2d 1090 (1995).

     With these guiding principles in mind, we turn to the issues in this case.

Relevance of the Other Offense Evidence

     The other offense evidence offered by the State and objected to by the defendant concerns the firing of shots at the Claridge Hotel, the Ambassador Hotel, and Cardinal Bernadin's residence.  The State contends the evidence was necessary to prove the defendant's intent to fire his gun at Rodriquez and that the  gun did not fire by accident.

     The State had to prove the defendant intentionally fired the gun at Rodriguez in order to establish first degree murder.  720 ILCS 5/9-1(a)(1) & (2) (West 1998).  The defendant responds there is no relevance because there is no similarity.  For purpose of our analysis we will assume the evidence was sufficient to allow the jury to conclude Bedoya fired the shots at the three buildings.

     There is no question that Rodriguez was killed at close range during a struggle with the defendant outside of a bar.  All the witnesses said so.  The other offense evidence had Bedoya wildly firing at random buildings from a moving car.  There is no evidence Bedoya saw any people in those three buildings or was trying to hit anyone when he fired the shots.  The  evidence could not have been offered to show Bedoya was the kind of person who intentionally fires his gun at every opportunity; that would be propensity evidence, not relevant other offense evidence. 

     There are no common victims here, as in 
People  v. Illgen
, 145 Ill. 2d 353, 583 N.E. 2d 515 (1991), where the supreme court agreed with the State that evidence of the defendant's prior assaults on his wife helped prove the defendant's intent to murder her.  See also 
People v. Burgess
, 176 Ill. 2d 289, 308, 680 N.E. 2d 357 (1997) (prior acts of abuse by defendant toward victim admissible to prove intent where defendant was charged with killing 3½ year-old child). 

     Nor did Bedoya fire his gun at the three buildings and at Rodriguez out the window of his car "as he drove at night in a northwesterly direction on the same stretch of Milwaukee Avenue

in Chicago," as was true in 
People v. Bartall
,  98 Ill. 2d at 310
 (evidence of a separate, later shooting incident was relevant to the defendant's criminal intent at the time he fired the shot that killed a young woman standing in a nearby parking lot).

     A defendant's intent to commit murder can be derived from the fact that he intentionally fired a shotgun into one person's abdomen fifteen minutes before he fired the same shotgun into 

[the victim's] abdomen.  
People v. Charles
, 238 Ill. App. 3d  752, 606 N.E. 2d 603 (1992).  In 
Charles
, the defendant's intent to deliberately fire at a person in a certain way in each instance was similar, to say the least.  No such similarity exists in the present case.   

     It is true that not much time had gone by between the shots at the buildings and the struggle with Rodriguez, somewhere around 45 minutes to an hour.  But proximity of time, even when accompanied by proximity of place, is not, standing alone, a sufficient basis to permit evidence of other offenses.  
People v. Lindgren
, 79 Ill. 2d at 139.  We do not see how, as a matter of law, the earlier shots at three buildings could make it more probable that the defendant intentionally fired his gun during the struggle with Rodriguez.

     We conclude the State was unable to bridge the "threshold of similarity" required for admissibility of other offense evidence.  Admitting the evidence was error.

The Danger of Unfair Prejudice

     Even if we were to find some relevance, however slight, in the other offense evidence, we are persuaded the way in which the evidence was presented, received, and argued requires reversal of

the defendant's conviction.  We refer to the danger of unfair prejudice, which "speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on

a ground different from proof specific to the offense charged."  
Old Chief v. United States
, 519 U.S. 172, 180, 136 L. Ed. 2d 574, 588, 117 S. Ct. 644, 651 (1997).  When other offense evidence possesses slight relevance, courts are less willing to run the risk of unfair prejudice.  See 
U.S. v. Torres
, 977 F.2d 321, 328 (7th Cir. 1992).

     The trial judge understood the need to balance probative value of the other offense evidence against the danger of unfair prejudice.  Our review of the record persuades us of the need to reweigh.  To do so, we visualize the apothecary's scales, equal arms with pans hanging below the beam on chains.  With nothing in the pans the scales are balanced.  When we place objects in the pans, the scales begin tipping one way or the other.

     In the pan on the left we place the slight probative value of the other offense evidence.  In the pan on the right we place, piece by piece, the presentation, in excruciating detail, of the other offense evidence, the prosecution argument concerning the other offenses, the trial court's failure to give a timely limiting instruction, and the trial court's refusal to tell the jury Bedoya had been acquitted of charges that he fired his gun at the three buildings.

The trial within the trial

     Someone fired shots at the three buildings from the moving car.  There was no dispute about that.  The issue was whether Bedoya or Koch fired those shots.  No amount of photographs,

bullets, or bullet casings could answer the question.

     Seven witnesses, live or by stipulation, testified to the earlier shootings.  Witnesses were asked to identify 22 photographs of the damage to the buildings, three photos of the damage to the armrest of the car and the bullets recovered from the car, and bullets and bullet casings found at the scenes.  The State was allowed to "put on a trial within a trial," a practice warned against in 
People v. Bartall
, 98 Ill. 2d at 315, and 
People v.McKibbons
, 96 Ill. 2d at 186.

     The detail and repetition presented to the jury had nothing to do with the purported purpose of the evidence--proof of Bedoya's intent and the absence of accident.  Constantly reminding the jury that one of the buildings fired at was Cardinal Bernadin's residence served no purpose other than to inflame the jury. 

     We have reversed convictions because of overkill in the presentation of other offense evidence.  In 
People v. Thigpen
, 306 Ill. App. 3d 29, 713 N.E. 2d 633 (1999), the defendant was charged with first degree murder and other crimes of violence arising from a gang-related shooting.  We held it was reversible error to introduce extensive testimony and photographic evidence of an uncharged double murder committed shortly after the murder being tried.  The killings were relevant to the defendant's identity as the killer and to his motive, but the failure to limit the evidence to its relevant purpose was error.

     In 
People v. Nunley
, 271 Ill. App. 3d 427, 648 N.E. 2d 1015 (1995), the defendant confessed to a murder and armed robbery.  He had confessed after being arrested sixteen months later for

attempting to decapitate his mother and killing her dog.  The State offered details of the later, uncharged offenses to explain why the defendant confessed to the murder and armed robbery.  Although the other offense evidence was relevant, allowing extensive testimony about it was held to be an abuse of discretion, despite the giving of a timely limiting instruction.  See also 
People v. Bennett
, 281 Ill. App. 3d 814, 666  N.E. 2d 899 (1996) (Error in armed robbery trial to offer extensive details of a prior armed robbery, even though relevant to defendant's 
modus
 
operandi
).

     The defendant's intent and absence of mistake were issues in 
People v. Brown
, 319 Ill. App. 3d 89, 745 N.E. 2d 173 (2001).  Brown was charged with committing aggravated battery of a child in February 1999.  Six of the State's 12 witnesses testified in detail to an uncharged September 1998 incident where Brown had physically harmed the same child.  This, said the court, was more than a mini-trial on other-conduct evidence, "it switched the focus of the trial to the prior incident."  
People v. Brown
, 319 Ill. App. 3d at 97.  Admitting the cumulative evidence, admittedly relevant, was one reason why the court concluded its confidence in the jury's verdict was undermined.  We reach the same conclusion in this case.

The State's arguments about the earlier shootings

     On several occasions the State's final arguments veered from the defendant's mental state at the time the fatal shot was fired.  Some examples:

     "Why does he have to tell you that is the way it happened, not that he was shooting those guns?  Because otherwise you'd know he was shooting his gun all night like he was and he was a time bomb waiting to go off.  That [sic] just the kind of guy, that's what he was doing that night.

***

     Where was that bullet hole in the chair? *** Had somebody been sitting there probably right about where the heart would have been, the upper chest.  It was a bull's eye.  Only nobody was sitting there. *** What about the Ambassador?  Bull's eye again. *** But now let's get to the Cardinal's residence.  Who did he serve and protect when he went to the Cardinal's residence?

***

     [T]his guy *** had other plans for the night, because, you know, he had such fun shooting up our city that maybe now he thought he would try for a real target.

***

     He just happened to get lucky that it was not the Cardinal who took a hit and it was Julian Rodriguez, a bouncer at a bar."

     The defendant's violent character and propensity to fire his gun were not relevant to the issues in this case.  The State's argument went beyond the borders of the relevant purpose of the other offense evidence.

Failure to timely instruct the jury

     In its pre-trial rulings, the court said it would give a limiting instruction when the other offense evidence was presented.  It did not.  Instead, the instruction came at the close of the final arguments.  See Illinois Pattern Jury Instruction, Criminal, No.  3.14 (3d Ed. 1992)(hereinafter IPI 3.14).  Because the defense made no timely objection to the lack of instruction this issue ordinarily would not merit discussion.  But, given the unusual circumstances of this case, prudence required offering the defendant a limiting instruction that might have "lessened the impact of the improperly admitted evidence."  
People v. Denny
, 241 Ill. App. 3d 345, 360, 608 N.E. 2d 1313 (1993); see Committee Comment to IPI Criminal No. 3.14.

Failure to tell jury about the acquittal

     Another jury had found Bedoya not guilty of the charges arising from the firing of shots at the three buildings.  Koch had pleaded guilty to those charges, although at trial he insisted Bedoya fired the shots.  While it is clear there was no constitutional bar to presenting evidence of the prior gunshots
, 
Dowling v. United States
, 493 U.S. 342, 107 L. Ed. 2d 708, 110 S. Ct. 668 (1990)
, the question of whether the jury should be told of the acquittal has not been directly addressed.

     We note that in 
Dowling
 the Supreme Court made a point of saying the trial judge did tell the jury the defendant had been acquitted of the other offenses.
  
Dowling
, 493 U.S. at 346.
  And in 
People v. Overton
, 281 Ill. App.3d 209, 666 N.E. 2d 753 (1996), we reversed an armed robbery conviction because the State introduced evidence that the arresting officer had received a radio dispatch regarding an armed robbery occurring at a Countryside gas station.  Responding to the State's claim that the other offense was relevant to the defendant's 
modus
 
operandi
 because it was similar to the robbery on trial, we said:

     "[T]he record shows that defendant was, in fact, acquitted of the Countryside robbery and therefore had no prior record.  The record also shows that the jury was never informed of defendant's acquittal."  
People v. Overton
, 281 Ill. App. 3d at 216.

     The IPI 3.14 limiting instruction given at the close of the case supports our conclusion that the jury should have been told about the acquittal.  The instruction informed the jury "evidence

has been received that the defendant has been involved in 
offenses
 other than that charged in the indictment."  (Emphasis added.)  The jury could have been left with the false impression that those "offenses" were alive and pending.  Fairness required disclosure.

     Given the trial events we have set out, we find the side of the scale that measures the danger of unfair prejudice substantially outweighs any relevance the other offense evidence might have had.  The risk of misleading or overpersuading the jury is palpable.  It requires reversal.

CONCLUSION

     For the reasons we have given, we reverse the defendant's conviction and sentence.  Because we also find the evidence is sufficient to support a verdict of guilty of first degree murder,

the case is remanded for a new trial.

     Reversed and remanded.

     HALL, P.J., and CERDA, J., concur.