**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210217-U

Order filed July 28, 2023.

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0217 Circuit No. 20-CF-289 |
| ROBERT L. HARRIS, | ) ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Albrecht concurred in the judgment.
Justice Brennan dissented.

_____

**ORDER**

¶ 1    *Held*: Defense counsel was ineffective for failing to object to prejudicial other-crimes evidence.

¶ 2    The defendant, Robert L. Harris, appeals his conviction of unlawful possession of a weapon by a felon (UPWF) and obstructing justice, arguing defense counsel was ineffective for failing to object to other-crimes evidence regarding the endangerment and subsequent death of a child.

¶ 3                                    I. BACKGROUND

¶ 4    The defendant was charged with endangering the health or life of a child (count I) (720 ILCS 5/12C-5(a)(1) (West 2020)), UPWF (count II) (*id.* § 24-1.1(a)), and obstructing justice (count III) (*id.* § 31-4(a)(1)) as a result of an accidental shooting that occurred on May 20, 2020. On March 30, 2021, the defendant and the State agreed to sever count I and proceeded to trial on counts II and III. At a jury trial, the State introduced evidence of Bonita Harris's 4:02 p.m. 911 call, stating that a minor, Jo.W., had been wounded by a BB gun. On the call, Bonita stated that her grandchildren were playing outside, found a gun, and one of them pulled the trigger. Bonita was afraid of the gun and did not want to go near it, but believed it was a BB gun. She stated Jo.W. was bleeding from his chest and had trouble breathing.

¶ 5    Peoria police officers Danny Marx Jr. and Andrew Redpath were dispatched to Bonita's house. Upon arrival, Marx discovered Jo.W. had a gunshot wound and not a wound inflicted by a BB gun as reported. Marx spoke with Ja.W., Jo.W.'s brother, who initially stated he was inside the house when he heard a loud bang outside. He ran outside and found Jo.W. lying on the sidewalk. Ja.W. stated that he threw the firearm into the neighbor's yard and showed Marx where he threw the gun, but it was not found. Redpath searched the house and did not find anyone else present.

¶ 6    Peoria police officer David Buss discovered a 9-millimeter bullet casing underneath a coat rack behind the front door. Buss discovered that the bullet passed through a sweatshirt that was hanging on the wall and then struck the doorframe. Buss recovered the bullet from the doorframe. Officers searched the home after obtaining a search warrant and discovered a bag of .38-caliber ammunition in a coat. No firearm or BB gun was discovered in the residence during the search.

¶ 7    Bonita testified that she lived in the house with her son, O'Bryan, and her grandchildren, Ja.W. and Jo.W. The defendant was only Ja.W.'s biological father but both children called the

2

defendant "dad." On the date of the incident, the defendant arrived at the house between 11 a.m. and 1 p.m. The defendant played with Ja.W. and Jo.W. Bonita went to take a nap and the defendant left. Bonita was later awoken when Ja.W. "slammed into" her bedroom door crying and stating Jo.W. was dead. Bonita exited her bedroom, saw the defendant, and told him to check on Jo.W. while she tried to calm down Ja.W. The defendant told Bonita to call 911, which she did.

¶ 8    Bonita testified that the defendant was still at the house when the ambulance arrived, but did not remember if he was there when police arrived. Bonita never saw a gun and denied mentioning a gun to the defendant at that time, but stated it was possible she told a detective that Ja.W. told her the defendant had left with a gun. Bonita did not know O'Bryan to own or have a gun or ammunition and believed the ammunition in the coat pocket could have belonged to her father who previously lived there. Bonita said the coat also could have been her father's or O'Bryan's since it was a smaller coat, and the defendant was much larger than O'Bryan or her father.

¶ 9    Ja.W. was 10 years old when he testified at trial and was granted immunity to compel him to testify. He testified that he and Jo.W. found the gun in the defendant's coat pocket that was hanging on a coat rack behind the front door. They started playing with it near the front door when it went off and a bullet struck Jo.W. Ja.W. then ran to tell Bonita. Ja.W. and Bonita woke the defendant who was napping in another bedroom. The defendant then took the coat and left before the police and ambulance arrived. Ja.W. testified that before the defendant left with his coat and gun, Bonita asked the defendant "[w]hy would you have this gun in my house when you know I have these kids here." Ja.W. also stated he initially lied to the police about how the incident occurred because the defendant told him to.

3

¶ 10    Detective William Calbow Jr. conducted multiple recorded interviews as part of his investigation, which were played in court. Calbow first spoke with Bonita and Ja.W. on the date of the incident. During this interview, Bonita stated that she called the defendant and told him to come to the house immediately because Jo.W. shot himself. Phone records did not support this claim and Bonita denied calling the defendant at trial. Bonita was interviewed again two days later, during which she stated Ja.W. told her the defendant left the house when the ambulance arrived. During Calbow's interview of Ja.W., he stated the defendant was not present during the shooting. Calbow stated Ja.W.'s statements in the video recording were "part of the initial story that [Ja.W.] gave before he told us the truth." Ja.W. also stated he did not see Jo.W. find the gun.

¶ 11    Calbow interviewed the defendant a week after the incident after the defendant had surrendered himself to the police. During the interview, the defendant stated he did not know where he was the day of the incident. He further stated he was not at Bonita's house that day but had been there the day before.

¶ 12    The parties stipulated the defendant was previously convicted of a felony. The parties also stipulated that Amanda Youmans would testify she was a forensic pathologist who performed Jo.W.'s autopsy. She found a gunshot wound on the left side of Jo.W.'s back and an exit wound on the left side of his chest. The bullet perforated Jo.W.'s left lung and heart, and Youmans opined that the cause of death was from the gunshot wound. The State rested, and the defendant's motion for a directed verdict was denied. The defense rested without presenting any evidence.

¶ 13    The State referenced the death of Jo.W. multiple times in both their opening and closing arguments. Notably, the State began its closing argument stating:

"[l]adies and gentlemen, on the afternoon of May 20th, 2020, [Ja.W.] was standing in his house next to his dying brother, [Jo.W.]. [Ja.W.] had just fired [a] gun, which hit [Jo.W.].

In that heartbreaking moment, when [Ja.W.] and [Jo.W.] need the defendant more than anytime in their life, what does the defendant do? Flees out of the house."

During their closing arguments, the State mentioned Jo.W.'s death or the fact that he had been shot more than 12 times.

¶ 14    The jury found the defendant guilty of both counts. The defendant filed a motion for a new trial arguing the State failed to prove him guilty beyond a reasonable doubt, the court erred in granting Ja.W. immunity, and the court erred in denying the defendant's motion *in limine* regarding prior convictions. The motion was denied. The court sentenced the defendant to concurrent prison terms of 10 years for UPWF and 3 years for obstructing justice. The defendant filed a motion to reconsider sentence which was denied. The defendant appealed.

¶ 15                                    II. ANALYSIS

¶ 16    On appeal, the defendant argues, *inter alia*, trial counsel was ineffective for failing to object to the prejudicial other-crimes evidence describing how the defendant left a firearm in a place where children could reach it, one child shot another child, and a child died as a result. The United States and Illinois Constitutions guarantee a defendant the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I § 8. Ineffective assistance of counsel claims are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffective assistance of counsel, a defendant must prove that (1) counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient

5

performance prejudiced the defendant, *i.e.*, a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 687; *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). Whether defense counsel rendered ineffective assistance is a mixed question of law and fact subject to *de novo* review. *People v. Bew*, 228 Ill. 2d 122, 127 (2008).

¶ 17 Evidence of offenses other than those at issue is generally inadmissible in order to "protect against the jury convicting a defendant because he or she is a bad person deserving punishment." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). But evidence of other crimes may be admissible "if it is relevant for any purpose other than to show the defendant's propensity to commit crimes." *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). "For instance, other-crimes evidence is admissible to show *modus operandi*, intent, identity, motive or absence of mistake." *Id.* at 135-36. "Evidence of other crimes [may also be] admissible if it is 'part of the continuing narrative of the event giving rise to the offense [citation], is intertwined with the event charged [citation], or explains an aspect of the crime charged that would otherwise be implausible [citation].' " *People v. Hale*, 2012 IL App (1st) 103537, ¶ 14 (quoting *People v. Outlaw*, 388 Ill. App. 3d 1072, 1086-87 (2009)). Continuing narrative acts are those " 'which concern the circumstances attending the entire transaction and they do not concern separate, distinct and disconnected crimes.' " *People v. Adkins*, 239 Ill. 2d 1, 32 (2010) (quoting *People v. Marose*, 10 Ill. 2d 340, 343 (1957)). However, even if other-crimes evidence is relevant, it should be excluded "if the prejudicial effect substantially outweighs the probative value." *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 31.

¶ 18 We find that counsel's performance was deficient for failing to object to the admission of the other-crimes evidence. First, the other-crimes evidence was not admissible. Because of the stipulation that the defendant was a felon and the fact that the counts were severed, the State only needed to prove the defendant possessed a firearm, and he intended to obstruct his prosecution by

6

concealing the firearm. Nothing required the State to prove the firearm was left where a child could find it or that the firearm caused a child's death. Evidence thereof served no legitimate purpose and instead was impermissibly used by the prosecution to "inflame the passions and prejudices of the jury." *People v. Porter*, 372 Ill. App. 3d 973, 979 (2007). What little relevancy, if any, this evidence had in proving a firearm was present in the home on the date of the incident or to further support the State's claim that the defendant intended to conceal the firearm is substantially outweighed by the unfair prejudice. Evidence of Jo.W.'s death was also not part of the continuing narrative in this matter. There were far less prejudicial ways to prove a firearm was present in the house on the date in question, and the defendant clearly had a motive to conceal the weapon given the stipulation that he was a felon and was alleged to be in possession of a weapon with police en route. For these reasons, the death was also not part of the continuing narrative which only required the State to prove the defendant possessed a firearm, police were called because a firearm was discharged, and the defendant removed the firearm before police arrived to conceal the fact he was a felon in possession of a firearm.

¶ 19        Second, even if we were to accept the State's argument that Jo.W.'s death was relevant to prove the defendant's intent to obstruct justice by concealing the firearm or permissible as part of the continuing narrative of events, "other-crimes evidence must not become a 'focal point' of the trial." *People v. Smith*, 406 Ill. App. 3d 747, 755 (2010) (quoting *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006)). Courts have repeatedly warned against presenting unnecessarily detailed or repetitive evidence of other crimes. *Boyd*, 366 Ill. App. 3d at 94; *People v. Bedoya*, 325 Ill. App. 3d 926, 940-41 (2001) ("The detail and repetition presented to the jury had nothing to do with the purported purpose of the evidence—proof of [the defendant's] intent and the absence of accident.").

7

¶ 20    Here, the State impermissibly made Jo.W.'s death a focal point of the trial. The State began closing arguments by referring to the death of Jo.W. as a "heartbreaking moment, when [Ja.W.] and [Jo.W.] need[ed] the defendant more than anytime in their life." The State then ended its closing argument again referring to Jo.W.'s death. The State also made repeated references to Jo.W.'s death throughout their opening and closing arguments and introduced the autopsy report, which unnecessarily detailed Jo.W.'s death. There was no strategic reason to allow the State to center the case around such prejudicial evidence of the untried offense of endangering the health or life of a child, and, therefore, counsel's performance was deficient by failing to object.

¶ 21    In coming to this conclusion, we reject the State's argument that evidence of Jo.W.'s death does not constitute other-crimes evidence even though the jury could infer from the evidence that the defendant endangered the health or life of a child because the State never explicitly stated the firearm was carelessly left where children could find it. "The fact that such evidence comes to the jury by way of inference does not alter its potentially prejudicial character." *People v. Lewis*, 165 Ill. 2d 305, 346 (1995). Evidence of Jo.W.'s death, allegedly caused by the firearm left in a place accessible by the children, was clearly evidence of a crime other than those at issue in this trial.

¶ 22    Turning to the second prong of the *Strickland* test, we must determine whether there is a reasonable probability the result of the proceedings would have been different had defense counsel objected to the impermissible other-crimes evidence. Here, the only witness who testified the firearm belonged to the defendant or that the defendant concealed the firearm from the police was Ja.W. who was 10 years old at the time of the trial and initially gave a contradictory statement to the authorities. Further, in her testimony, Bonita contradicted the information she provided in her video recorded interview several times. There was also ammunition found in a coat pocket that does not appear to have belonged to the defendant and did not match the caliber of firearm fired

8

inside the house. Moreover, as stated above, Jo. W.'s death became the focal point of trial, and the jury was not provided any limiting instruction for how to consider the other-crimes evidence. Given the lack of credible testimony or other evidence that the firearm belonged to the defendant, along with the highly prejudicial nature of the other-crimes evidence, we believe there was a reasonable probability the jury may have found the defendant not guilty of both counts absent the State's attempt to inflame their passions. We, therefore, reverse the defendant's convictions and remand for a new trial. We note that double jeopardy does not preclude a new trial as the evidence presented was sufficient to sustain the defendant's convictions. See *People v. Belknap*, 396 Ill. App. 3d 183, 213 (2009). Based this determination, we need not consider the defendant's other contentions.

¶ 23                                    III. CONCLUSION

¶ 24        The judgment of the circuit court of Peoria County is reversed and remanded.

¶ 25        Reversed and remanded.

¶ 26        JUSTICE BRENNAN, dissenting:

¶ 27        I respectfully dissent from the majority's reversal of defendant's convictions due to ineffective assistance of counsel. First, I do not agree that most of the complained-of other crimes evidence was inadmissible. Moreover, trial counsel used this evidence for strategic purposes to discredit Bonita and Ja.W., which otherwise defeats the majority's ineffective assistance analysis.

¶ 28        Initially, I take issue with the majority's truncated characterization of the evidence surrounding Jo.W.'s death as "other crimes" evidence. Most of this evidence was course of conduct evidence necessary to prove the charged elements and explain an otherwise confusing set of circumstances. *Hale*, 2012 IL App (1st) 103537, ¶ 14. The State was required to prove that defendant possessed a gun inside Bonita's apartment and that he fled the apartment with the gun

9

to obstruct his prosecution for possessing the gun as a felon. Here, however, law enforcement never saw defendant in the apartment, let alone in possession of a gun. Nor was a gun ever found. The only two witnesses to defendant possessing a gun in the apartment and fleeing with it both initially denied that defendant was present in the apartment when Jo.W. was shot. Further, it had been suggested in turn that Jo.W. had been shot with a BB gun, had shot himself outside the apartment with a gun found under a tree, and that it was Ja.W. who had secreted the gun somewhere outside the apartment. Adding to this confusion was unrelated ammunition found in a coat next to where defendant's gun was purportedly located by Ja.W., and that defendant's adult brother, and not defendant, lived in the apartment where the gun was found.

¶ 29     Under these circumstances, it would be all but impossible to prove that defendant had possessed a gun in the apartment and fled with it without getting into the circumstances leading up to Jo.W.'s death. Indeed, these facts "attend[ed] the entire transaction and they do not concern separate, distinct and disconnected crimes." (Internal quotation marks omitted.) *Adkins*, 239 Ill. 2d at 32. To prove that defendant fled with an actual (unrecovered) gun from the apartment, it was necessary to prove that there was a gun in the apartment in the first place. Given the inconsistent statements of the only two witnesses to this fact, the State was entitled to demonstrate that a gun was in the apartment by proof of the bullet casing on the floor and the bullet in the doorframe that presumably came from a single bullet fired through the body of Jo.W. The timing of Jo.W.'s gunshot wound and death was not elicited to inflame the passions of the jury, but to definitively prove the time an actual gun, and not a BB gun, was in the apartment.

¶ 30     That no gun was found at the scene of Jo.W.'s shooting when law enforcement arrived of course leads to the inference that someone secreted the gun from the scene. But who? Was it Ja.W., as he initially claimed, or defendant, as Ja.W. subsequently detailed? To prove beyond a

10

reasonable doubt that Ja.W.'s testimony was the truth, the State was entitled to argue that defendant fled the scene after Jo.W.'s death. The death of Jo.W., afterall, made it more likely that a thorough investigation as to the source of the gun would ensue. While I agree with the majority that the stipulated testimony of the forensic pathologist was unnecessary, I do not find it prejudicial under the circumstances. It was cumulative to evidence the State was otherwise entitled to and did introduce, *i.e.*, Jo.W.'s death by gunshot wound, absent any pictures or graphic details to raise the specter of reversible prejudice.

¶ 31        Also problematic, the majority's ineffective assistance analysis completely ignores the legitimate strategic reasons defense counsel did not object to the highlighted evidence. In assessing whether defense counsel's performance was reasonable, we must afford great deference to strategic decisions and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Given, as trial counsel emphasized, there was no physical evidence tying a gun to defendant, it was necessary to discredit the testimony of Bonita and Ja.W. that defendant possessed the gun and fled the scene after Jo.W.'s death. To discredit Bonita, the defense suggested that she framed defendant to deflect any blame she might have shared in Jo.W. obtaining a gun from her home and shooting himself and to reduce the likelihood of DCFS removing Ja.W. from her care. To discredit Ja.W., whom Bonita acknowledged on cross-examination "sometimes imagines things or sees things that aren't there," the defense attributed his claims that defendant was present to the shock of having shot and killed his half-brother. Evidence of Jo.W.'s death was necessary to each of these strategic attempts to discredit Bonita and Ja.W. Though defense counsel's strategic use of this evidence was ultimately unsuccessful, success is not the lens through which we measure reasonable assistance.

¶ 32        I would affirm defendant's convictions.

11