2017 IL App (3d) 150079

Opinion filed August 10, 2017

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2017

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-15-0079 Circuit No. 14-CF-274 |
| ERICK MAYA, | ) ) ) | Honorable Daniel J. Rozak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE LYTTON delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justice McDade concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Erick Maya, appeals following his convictions for first degree murder, attempted first degree murder, and unlawful use of a weapon by a felon (UUWF). He argues that the circuit court abused its discretion both by admitting certain evidence of defendant's prior bad acts and by failing to provide the jury with an instruction limiting the use of such evidence. Alternatively, defendant contends that defense counsel was ineffective for failing to request that jury instruction. As a separate argument, defendant contends that the circuit court abused its discretion in finding that the transcript of certain Facebook messages qualified for the business records exception to the rule against hearsay. Finally, defendant argues that the circuit court

failed to conduct a satisfactory inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984), after defendant made *pro se* posttrial claims of ineffective assistance of counsel. We reject defendant's evidentiary claims as well as the related claim of ineffective assistance of counsel. However, we remand the matter so the circuit court may make a proper preliminary inquiry into those separate, *pro se* claims of ineffectiveness raised by defendant at the posttrial stage.

¶ 2                                          FACTS

¶ 3        On March 6, 2014, the State charged defendant by indictment with first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)), attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2014)), and UUWF (720 ILCS 5/24-1.1(a) (West 2014)). The indictment alleged that defendant shot Briana Valle, causing her death; it also alleged that defendant shot Alicia Guerrero with the intent to kill her. Defendant's trial commenced on September 9, 2014.[1]

¶ 4        Guerrero testified that she and her family moved to 342 Emery Avenue in Romeoville in October 2013. Prior to that, they lived in a Chicago neighborhood by Cicero. Guerrero testified that her daughter, Briana, was born on July 21, 1998. In the summer of 2012, Guerrero had a Facebook account for herself under the name of Jessica Guerrero.

¶ 5        On August 24, 2012, Briana ran away from home. Guerrero immediately began searching for her and called the police. In her attempt to find Briana, Guerrero searched Briana's bedroom. In examining Briana's computer, Guerrero learned that Briana had been accessing Guerrero's own Facebook account. Guerrero saw that a number of messages had been exchanged between her account and a Facebook account under the name of Pandillero Diciochero. Guerrero had

---

[1]The trial in this matter lasted two weeks, producing a record of approximately 2000 pages. For clarity, we will summarize the evidence in chronological order of the events in question rather than the order in which the evidence was presented at trial.

never sent a friend request to that account and had not personally participated in that exchange of messages.

¶ 6    Through the messages, Guerrero learned that the owner of the Pandillero Diciochero account lived in Cicero. Briana had been gone for over a week when Guerrero went to Cicero in search of her. After driving around for some time, Guerrero spotted a building she recognized from the Pandillero Diciochero Facebook account. Guerrero called the police. However, after the police investigated, they informed Guerrero that Briana was not there.

¶ 7    The next day, Guerrero convinced the building's superintendent to allow her into the apartment. Briana was not there. However, soon thereafter, the renters of the apartment arrived. They told Guerrero that Briana was not there but was located at an apartment a block away. Guerrero then gave that information to the police and returned home while police investigated. Later, Guerrero received a phone call from a number she did not recognize. She did not recognize the male voice on the phone. The individual told Guerrero that he needed to return Briana and that he would do so as long as Guerrero did not press charges. After that phone call, Guerrero learned from the Cicero police department that Briana had been found. The date was September 10, 2012.

¶ 8    Abisai Ortiz testified that he lived with his girlfriend, Cynthia Avila, and their daughter in Cicero. Prior to December 2013, Ortiz and Avila lived in an apartment at 1342 South 50th Avenue in Cicero for "more than four, five years." At some point during that period, Ortiz's brother, Andres, also lived with him and Avila. Andres was friends with defendant, and through Andres, defendant came to live at 1342 South 50th Avenue with Ortiz, Avila, and Andres for approximately one year. Ortiz identified defendant in court but indicated that he did not refer to defendant as "Erick Maya" but instead referred to him as "Little Green."

3

¶ 9        Ortiz identified a photograph of Briana. He recognized her because she had been to the apartment on 50th Avenue. On September 10, 2012, a woman came to the apartment. Ortiz learned that she was Briana's mother and that she was looking for her daughter. Ortiz told Guerrero that Briana had been in the apartment but that he did not know where she was at that moment.

¶ 10       Ortiz testified he had a Facebook account and was active on the service. He recognized an exhibit shown to him by the State as a printout of a Facebook page under the name Pandillero Diciochero. He recognized the printout because he was friends on Facebook with the Pandillero Diciochero account. Ortiz testified that that Facebook account belonged to and was used by defendant. The State also showed Ortiz a printout of a second Facebook account, this one under the name of Gangero Jente Difiesta. Ortiz was not Facebook friends with this account but recognized the individual in the profile picture as defendant.

¶ 11       Ortiz also testified that he owned a cell phone and that his phone number was (708) 953-2118. He shared his phone with defendant, often allowing defendant to borrow it at night. The phone had internet access and was equipped with the Facebook application. Ortiz further testified that he exchanged text messages with defendant. From his own phone, Ortiz would send the text messages to a number of (773) 349-2942, to which defendant would reply.

¶ 12       Avila testified that while she was living at the apartment on 50th Avenue, she met a girl named Briana, whom defendant had brought to the apartment. Avila met Briana in late August 2012. Defendant was proud and happy when Briana was around. In speaking with Briana, Avila learned that she had run away from home. Some time after that, a Cicero police officer appeared at the apartment, looking for Briana. Avila was unable to help because she did not know where

Briana was at that particular time. Avila later met Guerrero when she came to the apartment looking for Briana.

¶ 13    Guerrero testified that Briana could not stop talking about a "Carlos" after she returned from Cicero. Guerrero told Briana to stop talking about him and confiscated her electronics. As time passed, Guerrero knew that Briana remained in contact with the individual. Guerrero testified: "When there's a will, there's a way. She'll find a way. She would sneak anything. She went to school and used people's phones. I got calls from him on my phone. I knew it was still continuing." Guerrero testified that the individual continued to contact her as well, and she came to recognize his voice. Guerrero learned from Briana that the individual's name was actually Erick Maya.

¶ 14    Guerrero testified that defendant's phone calls and text messages had been unceasing and that Briana had seen him around the neighborhood. In March 2013, fearing that defendant would attempt to influence Briana to leave again, Guerrero applied for an order of protection in Cook County on behalf of her and her family.

¶ 15    On February 14, 2013, Guerrero picked her daughter up from school. Briana was carrying balloons and flowers. Though Briana told her mother the gifts were from friends, Guerrero suspected they were from defendant. In September 2013, Guerrero noticed that Briana was wearing what appeared to be an engagement ring on her finger. The next month, Guerrero moved her family to Romeoville in an attempt to get away from defendant. Guerrero testified that Briana adjusted well to her new school and seemed to be making friends. At that time, Guerrero believed that Briana and defendant were no longer communicating.

¶ 16    In December 2013, Ortiz, Avila, and their daughter moved to an apartment at 5600 West Park Avenue in Cicero. Defendant moved in with them again. Avila testified that at that time,

5

defendant was still in love with Briana. Later, however, he told Avila that Briana had "broken up with him because she was actually moving on to somebody else." Avila observed that defendant was very mad about the situation. Avila testified: "[H]e wanted to kill her. He would say that he wanted to kill her because *** she was only supposed to be with him, only with him." He said that on more than one occasion. Defendant was also mad at Briana's mother, blaming her for Briana moving on. Avila testified that defendant was so angry that he would punch walls.

¶ 17    S.M. testified that she and Briana met and became friends while the two attended Romeoville high school. S.M. had a cell phone, and Briana once asked S.M. if she could use the phone to text someone. When S.M. began receiving text messages to her phone from a number she did not recognize, S.M. labeled that number in her phone as "Briana's guy." The phone number was (773) 349-2942. When S.M. received messages from that number, she would show them to Briana the next day.

¶ 18    In December 2013, S.M. saw a number of threatening text messages that had come to her phone from "Briana's guy." S.M. met with Romeoville high school resource officer Tom Dorsey and allowed him to take screen captures of the text messages. S.M. read for the jury a transcript of a text message conversation between Briana and defendant, in which Briana was using S.M.'s phone. Because of the relevance of these text messages to the issue that defendant has raised on appeal, we quote them at length.[2]

¶ 19    In those messages, exchanged on December 3 and 4, 2013, defendant explained that he had been in county jail since October of that year and had missed Briana. Briana told defendant

_____

[2]While actual copies of the text messages in question were entered into evidence, for the sake of clarity, we will transcribe S.M.'s reading of the text messages on the witness stand, rather than the text messages themselves.

that she missed him as well. As the conversation progressed, defendant began expressing anger and jealousy. S.M. read:

"[Defendant]: Why are you still talking to niggas for? I keep telling you to stop and you just won't listen. Am I not good enough for you that you got to talk and see other guys? I tell you to have respect for me and you just won't. I know you still talk to niggas. I know you have a new boyfriend. I know you cheated on me. I have a big, strong feeling. *** Stop lying to me and just tell me the niggas you still talk to and how many niggas have you cheated on me with. ***

*** 

*** Like I said, once a village hoe, always a village hoe. I'm sick and tired of telling, begging you please stop, please don't do that, don't do this. I'm tired and fed up. *** One day after you get tired of being the nation hoe, one day after you get tired of being used, abuse and reused by everyone, you finally realize that I had it good with Little Capone Erick did love me and now he is gone, out of my life forever. *** You talking and chillin with niggas, you cheating on me is what I don't want. I don't want to share you with no one. I want you all to myself. You are the person I want to spend the rest of my life with, but you can't see that and obviously don't want that. You are all I need and I am all you need, but I guess you are too young and stupid to know that. *** Any nigga don't matter who it is would have beat the living fuck out of you. When you killed the baby, they probably would have killed you and your fuckin mom but I didn't even though I thought about it I didn't lay a finger on you because I love you."

7

This portion of defendant's text messages continued in the same tone and substance for 4 pages of text transcript, 13 pages of trial testimony as read by S.M.

¶ 20    Over the next several days of text messaging,[3] Briana informed defendant that she did have a new boyfriend but explained that she was not cheating on defendant because defendant previously ended their relationship. Defendant struck a more conciliatory tone than previously, telling Briana that he loved her and begging her to get back together with him. In this portion of the messages, defendant occasionally referenced his memories of Briana, including their sexual relationship. Occasionally, S.M. responded to defendant's messages to inform him that she was not around Briana. On those occasions, defendant asked S.M. about Briana, as well as Briana's new boyfriend.

¶ 21    In the late hours of December 9, 2013, Briana said to defendant (S.M. reading):

> "Mmm, okay, but I don't want to have sex anymore, so, no, baby, I mean I don't want to be with you. Please understand me, I have a boyfriend. I have been with him for two months already. He is 17. He goes to my school. I'm moving in with him next year."

In reply, defendant described the situation as "bogus as fuck," and demanded the engagement ring back. Eventually, S.M. texted defendant herself, encouraging defendant to move on. When S.M. and defendant began exchanging messages, S.M. asked defendant what his name was, to which defendant replied: "[M]y name is gangero, cappone, lil green, but my real name is erick u can call me wat ever u want."

---

[3]People's exhibit No. 48, the transcripts of text messages sent from defendant to S.M.'s phone, is 30 pages long. S.M.'s testimony regarding and recitation of the text messages spans 125 pages of trial record.

¶ 22    In another exchange of text messages, beginning late on December 12 and continuing into the morning hours of December 13, Briana told defendant that she was happy with her new boyfriend. Defendant responded in part (S.M. reading):

> "[J]ust give me my shit back or I will go to your crib and steal everything your family has, your TVs, your jewelry, your money, everything, like I did before. I'm glad I did that to you. I made your pussy bleed and made you not walk right. I raped the shit out of you. Tell your new boyfriend how my dick tastes. On nation. I'm glad I took that shit whether you wanted it or not. I didn't let you leave my folks crib until I had my nut. Woowee crazy. Either you give me my mother fucking ring back or I will go to your crib and rape you again by gun point. I'll rape your mom and I'll have my folks tripas rape your mom and little brother. I don't give a fuck. My folks weasel will rape your brother and mom. He's been locked up before for rape. He don't mind getting some fresh meat you fucking hoe. You want to fuck behind my back while I'm in the county? It's cool. Just give my shit back you whore before I hurt you little hoe ass."

Later, defendant wrote (S.M. reading):

> "I'm a go pick up my ring, so have it ready before I kidnap you and keep you locked up in a trap and rape you for months. No one will ever find you. So if you know what's good for you, you will give me my ring back or else you know what's coming. Watch your back because either I get it back or I'm coming for that flat no good ass."

S.M. testified that all of the text messages sent from her phone were sent by either herself or Briana. S.M. did not allow anyone else to send text messages from her phone.

9

¶ 23    Dorsey, the Romeoville high school resource officer, testified that he met with Guerrero and Briana after reading the text messages sent to S.M.'s phone. Later, Dorsey placed a phone call to the number from which the texts had been sent. When no one answered, Dorsey left a message in which he explained that he was conducting an investigation regarding that phone number. Dorsey eventually received a return phone call. The individual who called Dorsey identified himself as Erick Martinez and admitted to sending the text messages in question. In his investigation, Dorsey acquired a photograph of defendant.

¶ 24    Kelley Henson, a detective with the Romeoville police department, testified that she received permission from Guerrero to take control of her Facebook account. Henson was then able to retrieve a number of messages that had been sent to Guerrero's Facebook account from the account bearing the name of Pandillero Diciochero. Henson read for the jury a series of messages that the Pandillero Diciochero account sent to the Jessica Guerrero account on December 24, 2013. In the messages, defendant apologized to Briana, told her that he loved her, and wished her a merry Christmas. Defendant ended the messages by writing "8-24-12 always n for ever :) erick and briana always n forever for eternity <3."

¶ 25    Henson further testified that she executed search warrants for the Facebook account bearing the name of Gangero Jente Difiesta. A portion of a January 26, 2014, conversation between the Difiesta account and an account bearing the name of Brian Lopez was published to the jury. The defense took exception to the Difiesta-Lopez Facebook transcripts coming into evidence through Henson's testimony. The State maintained that the transcripts satisfied the business records exception to the rule barring hearsay. In support, the State filed a certificate of authentication, in which an authorized custodian of records for Facebook averred that "[t]he records provided were made and kept by the automated systems of Facebook in the course of

10

regularly conducted activity as a regular practice of Facebook. The records were made at or near the time the information was transmitted by the Facebook user."

¶ 26    In the conversation, the Difiesta account asked Lopez if he had a gun. Lopez replied that he did and sent pictures of two guns to the Difiesta account. The Difiesta account agreed to pay $250 for one of the guns. The two then set up a time to meet each other. The Difiesta account told Lopez that his phone number was (708) 953-2118.

¶ 27    Jasmeet Atwal testified that he had met defendant years earlier on MySpace. The two would talk online, as well as exchanging phone calls and text messages. Some time in late 2013, Atwal told defendant that he had stolen a gun. Atwal testified that defendant had reacted excitedly upon hearing that news. In January and February 2014, Atwal and defendant exchanged numerous text messages.

¶ 28    Atwal identified People's exhibit No. 40 as a transcript of text messages exchanged between himself and defendant beginning on January 5, 2014, and continuing through the early morning hours of February 13, 2014. The transcripts, which were distributed to the jury for the duration of Atwal's testimony on the topic, showed that on January 24, defendant wrote to Atwal: "let me borrow dat thang ill pick it up next week." On February 1, defendant inquired: "u think I can get that thang 2day give it back by tuesday." The parties then had the following exchange on February 8:

> "[Atwal]: My boy is asking around right now.
>
> [Defendant]: I thought he already had it.
>
> [Atwal]: Its from his cousin he said if his cousin dont have that fifty then
>
> we can get a nine Or a 45."

Atwal explained at trial that the "thing" or "thang" to which he and defendant were referring to was a gun. Defendant picked up the pistol at Atwal's apartment on February 1 or 2, 2014.

¶ 29    J.S. testified that when she was a sophomore in high school, she maintained a Facebook account. In December 2013, she received a Facebook friend request from the account of Gangero Jente Difiesta. Though she did not recognize the name, she accepted the request and began exchanging messages with that account. Those messages continued through February 2014. J.S. identified People's exhibit No. 3 as a printout of the Gangero Jente Difiesta Facebook account with which she communicated and confirmed that the main profile picture was a photograph of the individual related to the account that she would eventually meet in person.

¶ 30    J.S. testified that the individual with whom she was messaging identified himself as Carlos. She met Carlos for the first time after school on January 15, 2014. She identified defendant as the individual she met that day. After that meeting, J.S. continued messaging defendant through Facebook and met with him again two weeks later. At the second meeting, J.S. met defendant's roommates, who she described as a male, female, and a small child.

¶ 31    J.S. identified People's exhibit No. 54 as a transcript of Facebook messages exchanged between herself and the Gangero Jente Difiesta Facebook account. J.S. read a message that was sent from the account on the night of February 9, 2014: "Whatever happens I need you to always be with me. Don't cheat and lie. And if one day I disappear, wait till I come back. If I go to jail or really long time, wait till I come [out]." In further messages, J.S. implored defendant not to do anything that might result in his going to jail; defendant continued to insist that J.S. wait for him if he went to jail.

¶ 32    After that exchange of messages, J.S. met with defendant again on February 11, 2014. She and a friend walked from school to defendant's apartment, arriving just after 8 a.m.

12

Defendant, however, was not home. Defendant arrived an hour later, explaining to J.S. that he had been "[p]icking up some money." That day at defendant's apartment, defendant and J.S. had a similar conversation in which defendant requested that she wait for him. She never saw defendant again after that meeting.

¶ 33        Stephen Sanders testified that he was working for Morton Taxi in February 2014. On the morning of February 11, 2014, Sanders accepted a call to pick up an individual in Cicero and drop him off in Romeoville. At approximately 6 a.m., he arrived at the pick-up address, where defendant entered the cab. When Sanders dropped defendant off, he gave defendant a Morton Taxi business card with his personal phone number on the back. Defendant called Sanders later that morning to inquire about being driven back to Cicero, but Sanders had already left the area.

¶ 34        On the morning of February 13, 2014, Sanders received a call on his personal phone from defendant. At 6 a.m., Sanders picked up defendant from the same place in Cicero as he had two days earlier. Upon picking defendant up, Sanders noticed that he was "stressed out" and anxious. Defendant was wearing dark clothing. Sanders recalled that defendant spoke of a girl in Romeoville during the drive, but Sanders could not remember the details. Sanders drove defendant to Romeoville, dropping him off, at an address he recalled as being 320 Emery Lane, at approximately 6:45 a.m. Days later, Sanders identified defendant in a photographic lineup as the individual he twice drove to Cicero.

¶ 35        An audio recording of a phone call was played in court. That phone call was made on February 11, 2014, at 5:13 a.m. from Ortiz's phone to Morton Taxi, which recorded the call. In the recording, a man, who identifies himself as Carlos, requests a cab to pick him up at 5618 West Park Avenue in Cicero and drop him off at 320 Emery Avenue in Romeoville. Ortiz, who

13

had listened to the recording of the phone call earlier, identified defendant as the individual making the call. Ortiz was familiar with defendant's voice from years of living with him.

¶ 36 On the morning of February 13, 2014, Briana woke Guerrero around 6:50 a.m. Guerrero put on shoes and a jacket over her pajamas as Briana got ready for school. The two then went out to Guerrero's car, which was parked in the driveway. Guerrero got into the driver's seat while Briana got into the front passenger's seat. Guerrero was putting her seatbelt on when she heard a pop. Guerrero testified:

> "I remember thinking someone knocked on my window so hard and I was so angry, and I remember turning and looking at my daughter. And first I saw glass all over the floor and I was like oh, my God, why did they have to hit my window so hard. When I looked she wasn't moving, she was slouched sideways towards me."

¶ 37 Guerrero then saw a male standing outside the front passenger window. The individual was wearing a black hooded sweatshirt with some "orange rusty color" on it and holding a revolver. In the moment, Guerrero was not able to make out any other distinguishing characteristics. As Guerrero begged the individual to stop, he shot her in the shoulder. Guerrero testified:

> "I jumped back and I just remember seeing blood gushing out of me and I thought I was going to die and no one was going to find my daughter, so I pushed my horn and I started screaming for my husband to come out but he couldn't hear me, so I just kept putting my horn and then I grabbed my alarm system keypad and I pushed the panic button."

¶ 38 Alejandro Valle testified that he was married to Guerrero. He testified that he had lived in Romeoville with Guerrero and their son. Briana, was his daughter. Alejandro testified that he returned home from work at approximately 5 a.m. on the morning of February 13, 2014. He fell asleep before Briana left for school that morning. He went outside later that morning to see Guerrero screaming and crying. He saw Briana, and she was unresponsive. Alejandro testified: "There was blood all over." On February 15, 2014, doctors at Loyola Hospital told Alejandro that Briana was brain dead.

¶ 39 A number of neighbors and emergency personnel testified regarding the scene at 342 Emery Avenue on the morning of February 13, 2014. Neighbors described hearing pops, bangs, or gunshots, followed by screaming. First responders testified that Guerrero was screaming and bleeding from her neck, while Briana was slumped over in the front passenger's seat. The front passenger window was shattered.

¶ 40 Shelie Jones testified that she was living at 344 Emery Avenue on February 13, 2014. She lived at the home with her daughter, Triana James. Shelie testified that the sound of gunshots caused her to look through her front window that morning. Shelie saw an individual running toward 135th Street, in a direction away from 342 Emery Avenue. The individual was wearing a black hooded sweatshirt. James testified that she saw an individual dressed in dark clothing run past her house. James described the individual as "pretty small with a small build." She also described the individual as "[p]retty lean." The individual was wearing a hood over their head. The individual was running in a direction from 342 Emery Avenue and toward 135th Street.

¶ 41 On February 13, 2014, at approximately 7:12 a.m., Dorsey was called to the scene of a shooting at 342 Emery Avenue. Upon arriving at the scene, Dorsey was informed that the victims were Alicia Guerrero and Briana Valle. Recognizing those names from his December

15

investigation, Dorsey returned to the police station to print his previous report. Dorsey also printed copies of the photograph of defendant and distributed those to officers upon returning to the scene between 8 and 8:30 a.m.

¶ 42    Dylan Somma testified while in the custody of the Illinois Department of Corrections (IDOC) based on three felony convictions. He testified that prior to entering IDOC custody, he lived at 332 Emery Avenue in Romeoville in February 2014. Somma testified that his mother, knowing that he had warrants out for his arrest, woke him that morning to tell him that there were "police *** everywhere." Somma thought that the police were in the vicinity to raid his mother's house, so he ran. He left the house through the back door and ran through his own backyard. Somma testified that he was trying to get to his friend's house, elsewhere in the neighborhood.

¶ 43    While running, Somma jumped over a fence, cutting his right hand in the process. Somma eventually made it to his friend's house, but no one responded to his knocks on the front door. As he moved to the back door, he saw a police officer in the adjacent yard. Somma began running again, this time onto Hickory Avenue, two streets away from Emery Avenue. Somma was eventually apprehended by police officers in the backyard of a house on Hickory Avenue. Somma testified that he had no knowledge at that point that there had been a shooting. He did not know any people by the names of Briana Valle or Alicia Guerrero.

¶ 44    On cross-examination, Somma testified that he is Hispanic with long brown hair. He testified that he was wearing a black hooded sweatshirt and blue pants while he was running from the police on February 13, 2014. He wore a grey sweatshirt under the hooded sweatshirt. Somma's hands were not tested for gunshot residue nor was the wound on his right hand ever photographed. He testified that he had never held a gun before.

16

¶ 45    Jonathan Allen of the Romeoville police department testified that on the morning of February 13, 2014, he arrived at 342 Emery Avenue with a police dog named Spike. After receiving initial information from officers on the scene, Allen began patrolling the area with Spike. While in his squad car, Allen received a call that an individual wearing dark clothing had been seen jumping over fences. Allen proceeded to Hickory Avenue where he observed the same and immediately moved to cut the individual off. Allen proceeded on foot, jumping over fences in pursuit of the individual. Allen eventually entered the backyard of 328 Hickory Avenue, where other officers had detained Somma.

¶ 46    After Somma was taken into custody, Allen continued to patrol the neighborhood. He was on foot with Spike searching for a weapon when he reentered the backyard on Hickory Avenue in which Somma was taken into custody. Upon entering the yard, Spike began to growl. Allen turned in the direction that Spike was growling and observed a leg protruding from underneath a porch. Allen drew his weapon and advised officers via radio that he had a subject at gunpoint. Other officers came to the yard and placed the individual under arrest. Allen had previously been shown a picture of the shooting suspect, and the individual placed under arrest matched that picture. In court, Allen identified that individual as defendant.

¶ 47    Michael Ryan of the Romeoville police department testified that he met with other officers at 342 Emery Avenue to discuss a plan of investigation. After learning that defendant was a possible suspect, Ryan was assigned to visit two addresses in Cicero. Ryan arrived at 5600 West Park Avenue in Cicero at approximately 5 p.m. Upon arriving at that apartment, Ryan made contact with Avila. Avila told Ryan that defendant had been staying in the apartment. When Ryan asked Avila what defendant used for transportation, Avila provided Ryan with the business card for Morton Taxi. A phone number was handwritten on the back of the card.

17

¶ 48        On February 16, 2014, three days after the shooting, Ryan assisted in the search for a weapon. During the search, Ryan found a handgun in the snow between two fences, on the south side of 135th Street between Hale Avenue and Hickory Avenue. The gun was collected by evidence technician Brandon Helton. Helton noted that the gun contained three unfired bullets, and the casings of three fired bullets. He described the gun as a pearl-handled revolver, and identified a photograph of the gun. Viewing the same photograph, Atwal testified that the gun in the photograph was the same gun that he had given to defendant.

¶ 49        Woodsman Jones of the Romeoville police department testified that on the morning of February 13, 2014, he was dispatched to the area of 328 Hickory Avenue to assist in the apprehension of a suspect in a shooting that had occurred that morning. When Jones arrived at the scene, the suspect, who Jones identified as defendant, had already been taken into custody. Jones was tasked with transporting defendant to the police station. Jones testified that defendant was wearing a black zip-up hooded sweatshirt with red writing on the front and a red lining in the hood. He was also wearing blue jeans and "an ankle bracelet." Upon arriving at the police station, Jones collected defendant's clothing as evidence. The zip-up sweatshirt would later be transported to the Illinois State Police crime lab.

¶ 50        The parties stipulated that defendant had been convicted of a felony offense in Cook County on October 4, 2013. The parties further stipulated that defendant's ankle bracelet recorded when defendant left and returned to 5600 West Park Avenue but did not record GPS locations. Monitoring records would show that defendant left his residence at 5:36 a.m. on February 11, 2014, and returned home at 9:11 a.m. Those same records would show that defendant left his residence at 6:01 a.m. on February 13, 2014.

¶ 51    Mary Wong testified that she was a forensic scientist with the Illinois State Police, specializing in gunshot residue. Wong explained that the series of explosions that create a gunshot produce a small cloud of gas, which cools to form gunshot residue particles. Samples taken from the backs of defendant's hands tested negative for gunshot residue particles.

¶ 52    Wong also tested the zip-up sweatshirt that was removed from defendant. She tested the right and left cuff areas of the sweatshirt. Gunshot residue particles were found on the right cuff, from which Wong concluded that the right cuff of defendant's sweatshirt "either was in the vicinity of a discharged firearm or it came in contact with a primer gunshot residue-related item." She also found "consistent particles" in testing portions of defendant's pants, which led her to the same conclusion.

¶ 53    After each party had presented its case-in-chief, the court and parties discussed the proposed jury instructions. Neither party proposed an instruction limiting the purposes for which bad acts evidence could be considered. No such instruction was thus delivered to the jury, either orally or in the packet of jury instructions.

¶ 54    In defense counsel's closing argument, he insisted that the Romeoville police department had rushed to judgment against defendant once it suspected him of the charged offenses. In so arguing, the defense repeatedly referenced Somma. In fact, the defense argued:

> "Dylan Somma, ladies and gentlemen, we will talk a lot about because it's our position that not only did the prosecution not prove beyond a reasonable doubt that [defendant] committed these offenses, but I would submit to you even though we don't have a burden of proof, we proved to you beyond a reasonable doubt that the killer was Dylan Somma."

The jury found defendant guilty on all counts.

¶ 55      On October 8, 2014, defendant filed a *pro se* motion for a new trial in which he alleged that defense counsel had been ineffective. At a hearing held six days later, defense counsel told the court that defendant wished to withdraw his *pro se* motion. Defendant confirmed that he was voluntarily withdrawing his motion. Defense counsel subsequently filed a motion for a new trial on defendant's behalf, which was denied. The presentence investigation report listed defendant's date of birth as July 9, 1990. On October 20, 2014, the court sentenced defendant to terms of imprisonment of 72, 39, and 11 years, to be served consecutively.

¶ 56      On December 30, 2014, defendant filed a *pro se* motion for reduction of sentence. In that motion, defendant listed 33 separate grounds on which he alleged counsel had provided ineffective assistance. One such allegation read: "Defendant's counsel threatened him that if he did not withdraw his motion for ineffectiveness of counsel he would testify against him and make sure he would never get an appeal by fabricating false statements against him." The court held a hearing on defendant's motion but did not allow defendant to argue any of his ineffectiveness claims. The court ultimately denied the motion.

¶ 57      Defendant filed another *pro se* motion for new trial on January 29, 2015. In that motion, defendant reiterated his previous claims of ineffective assistance of counsel. The court did not address the motion.

¶ 58                                         ANALYSIS

¶ 59      Defendant raises a number of independent arguments on appeal. The majority of those arguments relate to the admission of what he describes as "large amounts of highly prejudicial other crimes and bad acts evidence." Primarily, defendant contends that the circuit court abused its discretion by admitting such evidence at trial. He also argues that the court subsequently erred by not issuing Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter,

20

IPI Criminal 4th No. 3.14), which limits the purposes for which such evidence may be considered. Defendant also argues that defense counsel was ineffective for failing to request that instruction. Finally, defendant contends that certain evidence should have been barred as hearsay and that the circuit court abused its discretion in determining that the evidence qualified for the business records exception.

¶ 60     Alternative to his trial-based arguments, defendant contends that the circuit court failed to conduct a proper preliminary inquiry into his many posttrial, *pro se* claims of ineffective assistance of counsel. He maintains that the circuit court, under *Krankel*, 102 Ill. 2d 181, was obligated to inquire as to the factual basis for defendant's allegations in order to determine if there had been possible neglect of the case. For the reasons set forth below, we reject defendant's evidentiary arguments and affirm his conviction, but remand the matter so that the circuit court may conduct a proper inquiry into defendant's claims of ineffective assistance of counsel.

¶ 61                    I. Admission of Other Crimes and Bad Acts Evidence

¶ 62     Defendant identifies three groups of evidence which he claims were prejudicial to him: (1) the publication and recitation of Facebook messages exchanged between J.S. and defendant, (2) the publication and recitation of Facebook messages exchanged between Brian Lopez and defendant, and (3) the publication and S.M.'s recitation of text messages involving Briana, defendant, and S.M.[4] Defendant does not argue that the circuit court abused its discretion in

---

[4]As a technical matter, all of the Facebook messages in question were sent to or from the account labeled "Gangero Jente Difiesta," while the text messages in question were sent from a phone number labeled in S.M.'s phone as "Briana's guy." At certain points in his brief, defendant seems to concede that he participated in those communications, describing "correspondence between Defendant and other individuals" or "Facebook correspondence and text messages between Defendant and two of the State's witnesses." At other points, however, defendant implies that there is an open question concerning who actually wrote those messages, referring to messages sent by "a person alleged to be Defendant" or "an individual who was purportedly Defendant." The record shows that the State thoroughly and exhaustively proved that defendant owned and operated the Gangero Jente Difiesta Facebook account and that he

21

admitting, individually, each of those groups of evidence. Instead, defendant argues that those three groups of evidence, when combined, amounted to "overkill." See *People v. Bedoya*, 325 Ill. App. 3d 926, 941 (2001). In other words, defendant contends that the cumulative effect of all of the evidence cited was unduly prejudicial and that the circuit court abused its discretion in admitting that amount of evidence.

¶ 63        In other portions of his brief, defendant identifies other possible examples of prejudicial other crimes or bad acts. Specifically, defendant points to evidence that Briana ran away from home and was found in Cicero with defendant, evidence of the orders of protection obtained by Guerrero against defendant, and that defendant was wearing an ankle bracelet related to another offense. Defendant raises these pieces of evidence only in the context of his ineffective assistance of counsel argument, citing them as proof that counsel should have requested a limiting jury instruction. See *infra* ¶¶ 92-98. At no point does defendant argue that the circuit court abused its discretion in admitting these particular pieces of evidence. Accordingly, for the purposes of defendant's primary evidentiary argument, we only consider those three groups of evidence listed in the paragraph above.

¶ 64                                    A. Legal Principles

¶ 65        Rule 404(b) of the Illinois Rules of Evidence is titled "Other Crimes, Wrongs, or Acts." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). The rule provides that, with certain exceptions not relevant here,

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith *** [citations]. Such evidence may *** be admissible for other purposes, such as proof of motive,

_____

regularly used the phone number (773) 349-2942. Accordingly, for the remainder of this opinion, we will simply refer to Facebook and text messages written and sent by defendant.

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

As summarized by our supreme court prior to the adoption of the Illinois Rules of Evidence, "Evidence regarding other crimes is generally inadmissible to demonstrate propensity to commit the charged crime \*\*\*." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003).

¶ 66 The restriction on the use of other crimes or bad acts evidence is primarily based upon the tendency of such evidence to cause unfair or undue prejudice to a defendant. See *People v. Ward*, 2011 IL 108690, ¶ 47. Of course, all evidence is prejudicial, in that it is intended to persuade the finder of fact in one direction or the other. *E.g.*, *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25. In this context, as with the rules of evidence generally, the concern is with prejudice which is undue or unfair, the type of prejudice that "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). With other crimes or bad acts evidence, the possibility arises that juries will prejudge defendant based on their unrelated bad acts, or find them to be a "a bad person deserving punishment," independent of the evidence of the charged offense presented. *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980); see also *Ward*, 2011 IL 108690, ¶ 47.

¶ 67 Still, Rule 404(b) provides that such evidence *is* admissible for a number of other purposes besides propensity. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Where such evidence is admissible for another purpose, it is subject to the standard test applied to all evidence. *Donoho*, 204 Ill. 2d at 170.

¶ 68 Rule 404(b) thus contemplates a two-part inquiry. First, a court must determine if the evidence is offered for a purpose other than propensity; in other words, does the evidence tend to

prove or disprove that the defendant committed the charged offense. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); see also Black's Law Dictionary 1397 (10th ed. 2014) (defining "probative"). If the proffered evidence is not probative of anything except the defendant's propensity to commit crimes or engage in bad acts, it is inadmissible. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). If the evidence is relevant—in proving, for example, motive or intent—the court must then determine if that probative value is substantially outweighed by the danger of unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 69 Rule 403, in addition to setting forth the test for admissibility of prejudicial evidence, also prohibits the "needless presentation of cumulative evidence." *Id.* "Evidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009).

¶ 70 The prohibition of the needless presentation of cumulative evidence is closely related to the rule that evidence must be relevant or probative to be admissible. Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). As more identical evidence is presented to a jury, it stands to reason that the probative value of any such evidence will continue to diminish. *E.g.*, *Underwood v. Elkay Mining, Inc.*, 105 F.3d 946, 950 (4th Cir. 1997) ("There is a point of diminishing returns and a point at which additional evidence provides almost no value."). Moreover, as the probative value of each subsequent piece of cumulative evidence diminishes, the prejudicial effect, if there is any, remains the same, increasing the chances that the danger of undue prejudice will come to outweigh the probative value. Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011).

¶ 71 In the context of other crimes or bad acts evidence, courts are especially wary of accumulation, given the high danger of undue prejudice inherent in such evidence. In *People v. Nunley*, 271 Ill. App. 3d 427 (1995), the defendant was charged with murder. The defendant had

been arrested and taken to the police station for allegedly stabbing his mother and killing her dog. *Id*. at 428. It was in the police interrogation room that the defendant confessed to a murder he had committed years prior, the offense for which he would ultimately be charged. *Id*. Though the circuit court noted the possibility "the fact that some jurors may consider the killing of a dog more depraved than that of an individual," it allowed the State to present full evidence regarding the stabbing and the killing of the dog as part of a continuing narrative. *Id*. At trial, detailed testimony was provided by the arresting officer; in closing, the State referenced defendant's "reign of murder." *Id*. at 432.

¶ 72    The *Nunley* court agreed that some evidence of defendant's other crimes was relevant in demonstrating the voluntariness of his confession. *Id*. at 432. However, the court held that "the detail and repetitive manner in which the evidence was presented greatly exceeded what was required to accomplish this purpose [citation] and subjected defendant to a mini-trial over conduct far more grotesque than that for which he was on trial." *Id*. Similarly, in *Bedoya*, 325 Ill. App. 3d at 940-41, where seven witnesses testified regarding earlier, uncharged shootings, the court found that "[t]he detail and repetition presented to the jury had nothing to do with the purported purpose of the evidence—proof of Bedoya's intent and the absence of accident." Reversing the defendant's conviction, the court referred to that amount and repetition of other crimes evidence as "overkill." *Id*. at 941.

¶ 73                    B. Messages Exchanged Between J.S. and Defendant

¶ 74    The first group of evidence to which defendant takes exception is the publication and recitation of the Facebook messages exchanged between himself and J.S. In those messages, defendant repeatedly implored J.S. to wait for him if he should one day go to jail for a long time. See *supra* ¶¶ 31-32.

25

¶ 75 It is unclear how this series of messages constitutes evidence of "Other Crimes, Wrongs, or Acts." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Though defendant argues that the messages (in concert with the other identified groups of evidence) should have been inadmissible under Rule 404(b), he makes no effort to explain what "other" crime, act, or even wrong is implicated by the evidence. It was not a crime for defendant to ask J.S. to wait for him to return from jail nor was that an inherently bad act.[5] Though the messages give rise to an *inference* that defendant was contemplating committing a crime, the only actual crime or bad act that can be tied to that inference is the murder that occurred four days later. Of course that is not an "other" crime; rather, it is the actual offense defendant was charged with. In sum, the messages between defendant and J.S. do not constitute other crimes evidence under Rule 404(b) and show no apparent danger of undue prejudice.

¶ 76 C. Messages Exchanged Between Brian Lopez and Defendant

¶ 77 Defendant next takes exception to the publication and recitation of the Facebook messages between himself and Brian Lopez, claiming that those messages "added to the prejudicial weight of the other crimes evidence." Those messages detailed defendant's attempts to purchase a gun from Lopez.

¶ 78 Again, defendant asserts that the evidence in question was "other crimes" evidence but gives no explanation as to how or why that is the case. We surmise that defendant's messages might be construed as an attempt to commit the criminal offense of unlawful possession of a weapon by a felon. In any event, Rule 404(b) is broader than "other crimes," incorporating bad acts or wrongs, so we will assume, *arguendo*, that one's efforts to illegally obtain a firearm constitutes a "wrong." *Id.*

---

[5]We note that the circuit court properly exercised its discretion in prohibiting all references to any sort of romantic relationship between defendant and J.S.

¶ 79        Defendant's messages to Lopez were probative of defendant's intent to commit and preparation for the charged murder. Between the messages and Atwal's testimony, the State showed that defendant was looking for a gun for a period of time before Briana was murdered. It was also a key piece of the State's timeline, falling between the threats of December 2013 and the shooting in February 2014. On a more basic level, evidence that a defendant is searching for a gun is of clear probative value where that defendant is charged with shooting a person. Further, in those messages to Lopez, defendant, through the Gangero Jente Difiesta Facebook account, told Lopez that his phone number was (708) 953-2118. This bolstered the State's case in connecting defendant, his Facebook account, and defendant's use of Ortiz's phone.

¶ 80        The Lopez messages were thus probative of a number of elements rather than on defendant's propensity to commit crimes or wrongs. That evidence would not be automatically barred by Rule 404(b). Further, we find that the risk of undue prejudice arising from those messages was low. Defendant was charged with first degree murder and attempted first degree murder. It is highly unlikely that the jury's verdict would conclude that defendant was a "bad person deserving punishment" because he tried to procure a gun. *Lindgren*, 79 Ill. 2d at 137. Accordingly, we find that the circuit court did not abuse its discretion in admitting this evidence.

¶ 81                    D. Messages Exchanged Between Briana, S.M., and Defendant

¶ 82        Finally, defendant takes exception to the publication and recitation of the text messages exchanged between himself, Briana, and S.M. In that lengthy exchange of messages, defendant exhibits jealousy toward Briana, then anger, as he repeatedly threatens to rob, rape, murder, or kidnap Briana or her family members. The messages also included multiple references to the sexual relationship between defendant and Briana.

27

¶ 83　　　　First, we note that the messages in question were significantly probative with respect to the charged offenses in a number of ways. On a simple level, defendant's threats to harm Briana were probative of his intent and probative of his identity as the shooter. Defendant's history with Briana and anger toward her make him much more likely to be the shooter than Somma. Further, defendant's severe jealousy upon learning that Briana had a new boyfriend was probative of his motive for killing her. Defendant's inclusion of Briana's family in his series of threats was probative of his preparation or plan, given that he was also charged with the attempted first degree murder of Guerrero. More broadly, the messages from December 2013, in conjunction with the State's evidence from the next two months, further demonstrate the timeline of defendant's preparation; that is the evidence allows the inference that defendant decided to kill Briana sometime in December 2013. And again, each of these factors were themselves probative of identity, which the defense brought into issue by so extensively arguing about Somma.

¶ 84　　　　Though the messages in question had great probative value, they also carried a danger of unfair prejudice on a number of grounds. Primarily, the messages contained some graphic references to the sexual relationship between defendant and Briana. Given the ages of defendant and Briana, the existence of a sexual relationship between the two constituted defendant's commission of criminal sexual assault. The messages also included threats made by defendant and were rife with defendant's use of vulgar language, either of which might lead the jury to conclude that defendant is a person of bad character. See *Ward*, 2011 IL 108690, ¶ 47.

¶ 85　　　　Importantly, the number of explicit references to the sexual nature of defendant's relationship with Briana in the messages in question was somewhat few, especially when considered relative to the total length of the messages. To be sure, those references were there, but it was defendant's jealousy, not the sexual relationship itself, that was the main thrust of the

28

messages. In other words, defendant's criminal offense was never the focus of that presentation of evidence. See *People v. Perez*, 2012 IL App (2d) 100865, ¶ 47 ("When weighing the prejudicial effect of admission, a court should consider whether the other-crimes evidence will become the focus of the trial \*\*\*."). Further, while demonstrating defendant's anger and jealousy was vital to the State's case, showing jealousy without some reference to the existence of a romantic relationship would be almost impossible and quite confusing for the jury.

¶ 86 Defendant's threats and vulgar language carried less danger of undue prejudice. While we agree with defendant that evidence of such threats and use of vulgar language may convince a jury that a defendant is of bad character, that effect must necessarily be less than when evidence is presented that a defendant committed an actual criminal offense. Indeed, the prejudicial effect of other crimes, acts, or wrongs evidence must include a consideration not only of the seriousness of the other crime or wrong but also the gravity of the charged offenses. The *Nunley* court alluded to this principle when it pointed out that the defendant had been subjected "to a mini-trial over conduct far more grotesque than that for which he was on trial." *Nunley*, 271 Ill. App. 3d at 432.

¶ 87 The *Nunley* court's conclusion was logical: where the other crime or wrong is worse—or "far more grotesque"—than the charged offense, the possibility of undue prejudice is especially high. *Id*. The inverse is also true. By way of example, where a defendant is charged with misdemeanor disorderly conduct, and evidence is presented showing that he committed an unrelated murder, that evidence is likely to be prejudicial. On the other hand, where a defendant is on trial for murder and evidence is presented showing that he tended to use vulgar language, it is far less likely that such evidence will play any role in the jury's decision-making process. See also, *e.g.*, *People v. Carter*, 2016 IL App (3d) 140196, ¶ 39 ("[E]vidence that defendant wished

to escape from jail and acquired various items of contraband including hacksaw blades to do so was unlikely to inflame the passions of the jury. This is especially true when compared with the strong evidence of the relatively more heinous offense of attempted murder.").

¶ 88    In sum, the messages exchanged between defendant, Briana, and S.M., certainly contained some elements that risked undue prejudice against defendant. However, the messages were also highly probative in numerous ways. Given this great probative value, the circuit court's ruling that the probative value was not substantially outweighed by the danger of undue prejudice was not "arbitrary, fanciful, or unreasonable." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (providing definition of "abuse of discretion").

¶ 89    We also conclude that the admission of all of the evidence cited by defendant on appeal did not, collectively, amount to an abuse of discretion. The J.S. messages did not even constitute other crimes or wrongs evidence (see *supra* ¶¶ 74-75), and the Lopez messages carried little danger of undue prejudice (see *supra* ¶¶ 77-80). While the messages on S.M.'s phone certainly present a closer case, if the risk of prejudice there is not enough to constitute an abuse of discretion, the other messages in question do little more for defendant's case.

¶ 90    Furthermore, we find that the evidence presented in this case does not run afoul of Rule 403 or the "overkill" doctrine. See *supra* ¶¶ 69-72. The evidence in question added a great deal to what was before the jury, bolstering the State's case with respect to defendant's motive, intent, preparation, and, ultimately, his identity. Obviously each bit of identity evidence was important, given that the defense's closing argument was premised on Somma being the actual shooter. Further, the "overkill" doctrine, as explained in cases such as *Nunley* and *Bedoya*, contemplates trials in which another offense by a defendant becomes the focus of the trial. Here, evidence was presented that alluded to certain other criminal offenses committed by defendant as well as

30

certain "wrongs," such as making threats or using vulgar language. However, not one of those other crimes or wrongs ever became the focus of the trial, such that a "mini-trial" arose relating to that other conduct. See *Nunley*, 271 Ill. App. 3d at 432. Nor was evidence presented regarding any of those crimes or wrongs in needless detail and repetition. See *Bedoya*, 325 Ill. App. 3d at 941. Overall, the risk that the jury found defendant guilty in part because it found him to be a "bad person deserving punishment" (*Lindgren*, 79 Ill. 2d at 137) is especially low in light of the great amount of compelling evidence the State presented.

¶ 91                                           E. Jury Instructions

¶ 92        Defendant also argues that IPI Criminal 4th No. 3.14 should have been delivered to the jury in conjunction with the admission of other crimes or wrongs evidence. He contends first that the circuit court itself erred in failing to give that instruction *sua sponte*. Alternatively, he contends that defense counsel was ineffective for failing to request the instruction.

¶ 93        IPI Criminal 4th No. 3.14 informs jurors that when evidence of a defendant's other crimes or wrongs had been admitted, it may only be considered for certain purposes. That instruction thus ensures that such evidence will not be considered as character or propensity evidence, as barred by Rule 404(b). Because the State presented evidence of other crimes or wrongs committed by defendant, this instruction would have been appropriate if given.

¶ 94        Initially, neither party in the present case requested that the circuit court deliver IPI Criminal 4th No. 3.14. The defense was certainly on notice that evidence warranting the instruction would be presented but did not request the instruction pretrial, nor did it do so in a jury instruction conference. The circuit court itself does not have a duty to *sua sponte* deliver IPI Criminal 4th No. 3.14. *People v. Mullen*, 80 Ill. App. 3d 369, 375 (1980). Accordingly, we

31

proceed directly to defendant's argument that counsel was ineffective for failing to request the instruction.

¶ 95        Claims of ineffective assistance of counsel are analyzed under the two-part framework set forth in the seminal case of *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To prevail on such a claim, "[a] defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. In order to satisfy the prejudice prong, a defendant must prove a reasonable probability exists that, but for counsel's deficient performance, the outcome of the trial would have been different. *People v. Smith*, 195 Ill. 2d 179, 188 (2000). It is well-settled that courts "may resolve ineffectiveness claims under the two-part *Strickland* test by reaching only the prejudice component, for lack of prejudice renders irrelevant the issue of counsel's performance." *People v. Coleman*, 183 Ill. 2d 366, 397-98 (1998).

¶ 96        Defendant's ineffectiveness claim fails because there is no reasonable probability that the outcome of his trial would have been different had counsel procured the delivery of IPI Criminal 4th No. 3.14. The evidence at trial showed that defendant was infatuated with Briana but became jealous and enraged when the relationship ended. He repeatedly threatened to kill her. Soon thereafter, defendant attempted to procure a firearm. Just days before the shooting, defendant was apparently contemplating an act that would result in him going to jail for a long time. Defendant eventually did receive a gun from Atwal, who identified the gun he gave defendant as the one found by police blocks away from the scene of the crime.

¶ 97        The State showed that defendant took two cab rides from his home in Cicero to an address in Briana's neighborhood. The second of those cab rides occurred on the morning of the

32

shooting. Multiple neighbors testified that an individual generally matching defendant's description fled past their house after they heard gunshots. Defendant was arrested two streets over from the scene of the crime. The sweatshirt he was wearing at the time was later found to have gunshot residue particles on the right cuff.

¶ 98　　　　The jury concluded that defendant was guilty of murdering Briana and shooting Guerrero because the evidence presented allowed for no other conclusion. The circuit court's delivery of IPI Criminal 4th No. 3.14 would not have affected the outcome. Thus, we reject defendant's argument that defense counsel was ineffective for failing to request that instruction.

¶ 99　　　　　　　　　　　　　II. Business Records

¶ 100　　　　Within his other crimes arguments, defendant raises the independent and distinct argument that the Facebook messages exchanged between himself and Lopez should not have been admissible because they constitute hearsay. While those messages were admitted under the business records exception, defendant claims that ruling was an abuse of discretion. Though defendant failed to include this point in the "Issues Presented for Review" section of his brief, the State fully responds to the argument. Accordingly, we will consider defendant's contention that the Facebook posts were "not made to record any business event, nor are they made by any business during the regular course of business."

¶ 101　　　　Defendant's argument is directly contradicted by the certificate of authentication filed by the State accompanying the evidence in question. Rule 803(6), commonly known as the business records exception, provides that certain hearsay evidence is admissible where it constitutes

> "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a

33

regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11)." Ill. R. Evid. 803(6) (eff. Jan. 1, 2011).

¶ 102    The certificate of authenticity provided by a Facebook authorized custodian of records and filed by the State indicated that "[t]he records provided were made and kept by the automated systems of Facebook in the course of regularly conducted activity as a regular practice of Facebook. The records were made at or near the time the information was transmitted by the Facebook user." The certificate of authenticity complied with Rule 902(11), and thus provided the necessary foundation contemplated by Rule 803(6). The circuit court did not abuse its discretion in admitting the evidence.

¶ 103                    III. *Pro Se* Claims of Ineffective Assistance of Counsel

¶ 104    Finally, defendant argues that the circuit court failed to conduct an adequate inquiry into defendant's multiple *pro se* claims of ineffective assistance of counsel made in his postsentencing motion. The State confesses error and concedes that the matter should be remanded so that the circuit court may make the proper inquiry into defendant's claims.

¶ 105    When a defendant makes a *pro se* claim of ineffective assistance of counsel, the circuit court must examine the factual basis of that claim, appointing new counsel if the allegations show "possible neglect of the case." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). After he was sentenced, defendant filed a *pro se* motion explicitly setting forth 33 claims of ineffective assistance of counsel. The court, however, made no inquiry into those claims, refusing to allow defendant to argue those points. We therefore accept the State's confession of error and remand

34

the matter for the limited purpose of an inquiry into defendant's *pro se* claims of ineffective assistance of counsel.

¶ 106                                                    CONCLUSION

¶ 107        The judgment of the circuit court of Will County is affirmed in part and remanded with instructions.

¶ 108        Affirmed in part and reversed in part; cause remanded.