2022 IL App (1st) 191076-U

No. 1-19-1076

Order filed March 9, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 DV 71332 |
| | ) | |
| MATTHEW YBARRA, | ) | Honorable |
| | ) | Callie Baird, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm defendant's conviction for misdemeanor domestic battery where the evidence was sufficient to sustain his conviction, and the trial court did not abuse its discretion in admitting evidence of his alleged prior acts of domestic violence.

¶ 2     Following a bench trial, defendant Matthew Ybarra was found guilty of misdemeanor domestic battery and sentenced to one year of conditional discharge. On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt, and the trial court erred by admitting evidence of two alleged prior acts of domestic violence. We affirm.

¶ 3    Defendant was charged by misdemeanor complaint with domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2018)), arising from an incident in Chicago on March 23, 2018, during which he struck and choked his family or household member, Salina Bone.[1]

¶ 4    Prior to trial, the State filed a motion to admit evidence regarding defendant's three alleged prior acts of domestic violence pursuant to sections 115-7.4 and 115-20 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4, 115-20 (West 2018)). First, in late December 2017 or early January 2018, defendant and Salina fought in their residence while defendant's cousin was visiting. Defendant placed his hands around Salina's neck, obstructed her breathing, and slapped her. Second, in early February 2018, they fought while Salina's friend Tatiana Hill was present. Defendant insulted Salina, grabbed her shoulders, and swung her into a dresser, bruising her leg and ankle. Defendant then followed Salina and pushed her to the floor. Third, on March 15, 2018, defendant drove Salina home from work and made threats, including that he would "kill them both in the car." At home, he repeatedly pushed Salina to the ground, and she locked herself in the bathroom until he calmed down.

¶ 5    Defendant filed a response to the State's motion, asserting that the probative value of the other-crimes evidence was substantially outweighed by the prejudicial effect, and the incidents were not corroborated or factually similar to the present allegations. He also argued that the first and second incidents lacked specificity in time.

¶ 6    At a hearing on the motion, the State called Hill, who testified that she was at defendant and Salina's residence in February 2018. From the downstairs floor of the house, she saw

---

[1] Because Salina Bone and a witness, Samuel Bone, share the same last name, we refer to them by their first names.

defendant and Salina arguing upstairs. Defendant choked Salina, pushed her on the bed, "[s]lammed" her twice, and threatened her. Hill ran upstairs, separated them, and left with Salina. The State did not present evidence regarding the other incidents alleged in its motion.

¶ 7    The trial court granted the State's motion as to the incidents from December 2017 or January 2018, and February 2018. The court found that the probative value of those incidents outweighed the prejudicial effect, as they were close in time to the charged incident and also involved defendant choking Salina. Those incidents were therefore admissible for "any" of the purposes identified by statute and case law. However, the March 15, 2018, incident lacked sufficient factual similarity, and therefore was inadmissible. The trial court denied defendant's motion to reconsider.

¶ 8    At trial, Salina testified that on March 23, 2018, she had been dating defendant for eight or nine months and lived with him in a two-story residence on South Avenue M.[2] Salina saw defendant drink alcohol excessively more than 10 times and become aggressive.

¶ 9    On the evening of March 23, 2018, Salina was working as a cook at an establishment in La Grange, Illinois. At about 9 p.m., defendant arrived, drank beer, argued with Salina about her flirting with other people, and left. He returned about 10 minutes after midnight to drive Salina home. During the 40-minute drive, he was "aggressive" and "belligerent," his speech was slurred and profane, and he cut his knuckle punching his steering wheel.

¶ 10    At home, Salina's manager texted her about covering a shift in the morning. Salina and defendant went to their bedroom and argued about her reply. She got onto the bed and defendant

_____

[2] Salina testified that the incident occurred on the 90 block of South Avenue M, but the record elsewhere reflects the 9800 block of South Avenue M. The parties do not dispute the location.

punched her lip with a closed fist. She tried to stand, but defendant pushed her down. Salina then attempted to run downstairs. When she reached the stairs, defendant grabbed the back of her neck with one hand, choked her with both hands, and called her "the B word and the C word." She ran into the bathroom, but defendant followed, grabbed the back of her neck, choked her with both hands, and threw her into a closet space. She ran from the bathroom, and once defendant followed her out, she ran back into the bathroom and locked the door. She vomited each time defendant choked her.

¶ 11    Salina waited for defendant to calm down, and he sat by the door and apologized. When she opened the door, he grabbed her again, but she broke free, ran downstairs, and grabbed a phone. Defendant "dared" her to call the police, but she asked to call her father. Defendant consented, but her father did not answer the phone. Salina did not call the police because she was scared. Eventually, defendant drove her towards her father's house, but made a U-turn and said, "calm down" and "let's talk about this." They returned home and went to bed.

¶ 12    The next afternoon, defendant took Salina to her father's house. Defendant lacked visible injuries, but Salina had a "busted lip" and a knot on her head. Salina and her father went to the police station. The State entered photographs, included in the record on appeal, which depict a woman pulling her lower lip to reveal bleeding on the left side. Salina testified that the photographs depicted her injuries. Another photograph showed the right side of a man's face with two scrapes across the temple; Salina denied that defendant had the scratches on March 23, 2018.

¶ 13    Salina further testified that in late December 2017 or early January 2018, defendant's cousin was staying with defendant and Salina. Defendant joined Salina upstairs and asked her to go with him to take his cousin home. Salina declined, and defendant choked her with one hand,

slapped her with an open palm, and said, "I love you and I'll be back." Defendant then left with his cousin.

¶ 14    One morning in February 2018, about 2 or 3 a.m., Salina and defendant argued upstairs while Hill was downstairs. Defendant shoved Salina into a dresser and yelled at her. Hill ran upstairs and defendant grabbed Salina by the neck with one hand. After Hill separated the two, defendant again pushed Salina into the corner of the dresser. Hill packed Salina's belongings and they left.

¶ 15    On cross-examination, Salina testified that she never hit defendant and did not know how he sustained the scratches depicted in the exhibits. After the altercation on March 23, 2018, she remained at defendant's house for nine hours. The parties stipulated that Salina received a call from her father at 6:34 a.m. that lasted 179 seconds. She then testified that when she arrived at her father's house, she did not call 911 or go to a doctor. Instead, she went to the police station around 3:50 p.m. and told the police she could not "get away" from defendant, but did not expressly state that she was "not free to leave." She showed the police her lip and neck injuries, told them about the knot on her head, and photographs were taken.

¶ 16    Salina initially testified that she did not call defendant using "star 67" 39 minutes after going to the police station, and she was not sure if she had done so 39 minutes before going to the station. She later testified that on the day after visiting the police station, she made two phone calls to defendant using "star 67" because she was scared and "just wanted [her] things." That day, March 24, 2018, she went to defendant's house but did not stay the night.

¶ 17    Salina confirmed that she filled out a petition for an order of protection on March 26, 2018, which defendant entered into evidence. The petition, included in the record on appeal, is file-

stamped March 26, 2018. Salina read the petition, which stated that defendant cut her lips by striking her face and head, and choked her, causing her to vomit several times. The petition did not describe the two prior incidents from December 2017 or January 2018 and February 2018, but Salina was not aware the petition template provided for her to list numerous incidents. She also signed a petition for an order of protection on April 16, 2018, which only described the March 23, 2018, incident.

¶ 18    Salina could not recall the exact date of the February 2018 incident, but knew it occurred at the beginning of February. The incident from December 2017 or January 2018 occurred "around after Christmas."

¶ 19    Salina's father, Samuel Bone, testified that on March 23, 2018, defendant drove Salina to his house. Samuel was concerned about Salina based on her text messages, and observed a lump on her head, a mark on her mouth, and bruises on her neck. On cross-examination, Samuel testified that he called Salina at about 6:34 a.m., but she did not answer. He did not call 911 when Salina arrived at his house because he was "her 911."

¶ 20    Defendant called Chicago police detective Cecchin, who testified that on March 23, 2018, at about 3:50 p.m., Salina entered the station to report a domestic battery.[3] He saw an abrasion on Salina's lower lip, but did not recall other injuries or Salina reporting incidents from December 2017 to February 2018. Cecchin offered Salina medical services, which she declined, and he asked her to meet with an evidence technician.

---

[3] Detective Cecchin's first name does not appear in the transcript of proceedings.

¶ 21    Chicago police detective Mathis testified that he attempted to contact Salina about the case, but she did not respond and he did not photograph her injuries.[4]

¶ 22    Defendant called his cousin, Olivia Romero, who testified that she spent time with defendant and Salina at their house between Thanksgiving 2017 and New Years 2018. Romero never witnessed them argue or saw defendant hit Salina.

¶ 23    Defendant testified that during his relationship with Salina, they broke up four or five times. Defendant initiated most of the break ups, and Salina would become angry. One week prior to March 23, 2018, they broke up again. On March 22, 2018, about 11 or 11:30 p.m., defendant took Salina's vehicle to Samuel's house because it had a flat tire. Salina then wanted to go to defendant's house. They purchased vodka and arrived at defendant's house about 12:30 or 1 a.m.

¶ 24    Defendant and Salina drank until about 2 a.m. Defendant told Salina their relationship was "toxic" and "not working," and Salina became "distraught" and "hostile." Salina hit defendant, scratching and bruising the right side of his face. Defendant attempted to separate himself from Salina, but she followed him into the bathroom, pulled his arm, and cried. Defendant denied ever choking or hitting Salina, or that he noticed injuries on her face that night. The argument lasted about 2½ hours, no one came to the house during the argument, and defendant did not see Salina make any phone calls.

¶ 25    After the argument, defendant attempted to drive Salina to her father's house, but then told her it was not a good idea because they had been drinking. Salina agreed. Eventually, they got in bed and woke around 9 a.m. They went to Salina's father's house and arrived around 11 a.m. Later that day, defendant received one or two "star 67" calls from Salina, who wanted to come to his

---

[4] Detective Mathis's first name does not appear in the transcript of proceedings.

house. On March 25, 2018, around 2 a.m., Salina went to defendant's house, and they discussed getting back together, but defendant did not want to be with her. On March 28, defendant received a call from his grandfather advising him that the sheriff had visited "the house," and defendant turned himself in.

¶ 26    Defendant testified that the State's exhibits depicted the scratch marks and bruises he received when Salina hit him on March 23, 2018. He denied going to Salina's workplace that night. He also denied hitting Salina in December 2017 or January 2018, or that he argued or physically fought with her in the presence of Romero. However, defendant acknowledged having "disagreements" with her in front of Romero. Defendant recalled arguing with Salina in February 2018 after she "disrespected" his stepmother. During the argument, Salina repeatedly tried to pull his arm**,** but defendant denied hitting or choking her.

¶ 27    On cross-examination, defendant testified that Salina did not start "swing[ing]" at him until after 3 a.m. on March 23, 2018. She was uninjured when he picked her up on March 22, 2018, and he did not know how she received the injuries she exhibited at the time he dropped her off at her father's house.

¶ 28    Defendant entered Salina's phone records into evidence. They are included in the record on appeal and reflect "star 67" calls made from Salina to defendant. Namely, on March 23, 2018, at 8:11 p.m., Salina made a five-second call to defendant. On March 24, 2018, she called defendant twice between 4 and 4:30 p.m., twice between 7 and 7:30 p.m., and once at 11:17 p.m.

¶ 29    The trial court found defendant guilty of domestic battery. The lack of details in the prior orders of protection did not impeach Salina, as she made an "immediate outcry" in the instant case. Moreover, defendant was not credible, "couldn't tell [the court] how any of this happened," and

offered little detail as to how Salina scratched him. The court also stated that the calls Salina made around the time she went to the police station did not reflect that the incident did not occur.

¶ 30    Defendant filed a motion for new trial, alleging, *inter alia*, that the trial court erred in granting the State's motion to admit proof of other crimes. The court denied defendant's motion. After a hearing, the court sentenced defendant to one year of conditional discharge. Defendant did not file a motion to reconsider his sentence.

¶ 31    On appeal, defendant argues the State failed to prove him guilty beyond a reasonable doubt because Salina's testimony regarding the events of March 23, 2018, was "uncorroborated" and "implausible," and the timeframe in which she reported the incident undermined her credibility.

¶ 32    "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 33    We will not retry the defendant when reviewing a challenge to the sufficiency of the evidence. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the

evidence before it," or "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 34    To sustain defendant's conviction for domestic battery, the State had to prove beyond a reasonable doubt that he knowingly and without legal justification, by any means, caused bodily harm to a household member. 720 ILCS 5/12-3.2(a)(1) (West 2018). " 'Bodily harm' has been defined as physical pain or damage to the body, including lacerations, bruises, or abrasions, whether temporary or permanent." *People v. Thigpen*, 2017 IL App (1st) 153151, ¶ 29.

¶ 35    Defendant does not dispute that Salina was his household member at the time of the incident. Rather, he argues the evidence did not establish that he caused bodily harm to Salina.

¶ 36    After reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that defendant caused bodily harm to Salina. The State's evidence established that defendant visited Salina at her workplace, drank alcohol, and argued with her. As they drove home, he acted aggressively, showing inebriation and punching his steering wheel until he cut his knuckles. At their house, defendant punched Salina in the lip with a closed fist, pushed her, and twice grabbed her by the neck as she attempted to escape, choking her and causing her to vomit. This testimony sufficed to sustain defendant's conviction. *People v. Harris*, 2018 IL 121932, ¶ 27 ("[T]he testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant."); *People v. Taher*,

329 Ill. App. 3d 1007, 1018 (2002) (complainant's testimony alone was sufficient to sustain domestic battery conviction).

¶ 37    The State corroborated Salina's testimony with photographs showing that she suffered injuries to her lip, where she was punched. See *Thigpen*, 2017 IL App (1st) 153151, ¶ 29 (bodily harm is defined "as physical pain or damage to the body, including *** abrasions"); see also *People v. Golden*, 2021 IL App (2d) 200207, ¶¶ 110-11 (evidence supported convictions of domestic battery and aggravated domestic battery, where the photographs of the victim's injuries corroborated the testimony of a State witness and the victim's pretrial statements). In addition, Detective Cecchin testified that on March 23, 2018, the date of the battery, he noticed an abrasion on Salina's lower lip when she reported the battery.

¶ 38    Moreover, the State submitted evidence showing that defendant engaged in a pattern of domestic violence towards Salina, choking her on two separate occasions soon before the incident at issue. See 725 ILCS 5/115-7.4(a) (West 2018) (prior acts of domestic violence may be considered in domestic battery case). In sum, this evidence and the reasonable inferences therefrom was sufficient to show defendant caused bodily harm to Salina and to sustain his conviction for domestic battery.

¶ 39    Defendant posits that the trial court should not have found Salina credible due to the time it took her to leave his house and report the incident to the police, her phone records showing that she called him after the incident, and her apparently inconsistent testimony regarding the phone calls she had made. However, Salina specifically testified that she hesitated in reporting the incident because she was scared, and that she ultimately called and visited defendant to retrieve her belongings. The record supports the trial court's conclusion that Salina was credible despite

her hesitancy to report the incident or inconsistencies in her testimony, especially given the unique nature of domestic violence cases. See *People v. Jenk*, 2016 IL App (1st) 143177, ¶¶ 48-50 (finding the evidence was sufficient to sustain the defendant's domestic battery conviction where the victim did not report the defendant's physical abuse for about two months, but explained she still loved the defendant and was afraid to report him). The trial court's role was to determine Salina's credibility, and we will not substitute our judgment on such determinations. *Williams*, 193 Ill. 2d at 338.

¶ 40 Defendant next argues that the trial court erred in allowing the State to introduce two prior acts of domestic violence where the evidence was "speculative," highly prejudicial, and irrelevant to the March 23, 2018, incident. The State responds that the trial court exercised its discretion and conducted a proper balancing test to conclude that the evidence's probative value was not substantially outweighed by its potential prejudicial effect.

¶ 41 Under common law, relevant evidence of other crimes is admissible "for any purpose other than to show a defendant's propensity to commit crimes" (*People v. Chapman*, 2012 IL 111896, ¶ 19), and may be admitted to prove *modus operandi*, intent, identity, motive, or absence of mistake (*People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991)).

¶ 42 This common law rule was abrogated in part by section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2018)), which creates an exception for domestic violence cases. See *People v. Dabbs*, 239 Ill. 2d 277, 284-85 (2010). Under section 115-7.4(a), where the defendant is accused of domestic battery, evidence of the defendant's other domestic violence offenses are admissible "for its bearing on any matter to which it is relevant," including the defendant's propensity to commit crimes of domestic violence. 725 ILCS 5/115-7.4(a) (West 2018). Prior to admitting the

evidence, however, the trial court must weigh the probative value against any undue prejudice. 725 ILCS 5/115-7.4(b) (West 2012); see *Dabbs*, 239 Ill. 2d at 290-91. The court may consider "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2018).

¶ 43    Defendant argues for *de novo* review, positing that "the trial court misinterpreted the rules of evidence by failing to consider how the evidence was relevant and other relevant circumstances in this case when it made its ruling." The admission of evidence under section 115-7.4, however, remains within the sound discretion of the trial court, and the evidence may be admissible so long as it is relevant and its probative value is not substantially outweighed by the risk of undue prejudice. *Dabbs*, 239 Ill. 2d at 290-91. We will not disturb the trial court's decision to admit other-crimes evidence absent a clear abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). An abuse of discretion occurs where the trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Sutherland*, 223 Ill. 2d 187, 272-73 (2006). When applying this deferential standard, we must uphold the trial court's decision even if "reasonable minds [can] differ" about whether such evidence is admissible. *Illgen*, 145 Ill. 2d at 375-76.

¶ 44    A review of the record reflects that the trial court properly weighed the probative value of defendant's prior bad acts against their prejudicial effect and did not abuse its discretion in determining that two of the acts were admissible. Before trial, the court held a hearing on the State's motion to admit three incidents of prior domestic violence, during which the court addressed their prejudicial effect. See *Jackson*, 2014 IL App (1st) 123258, ¶¶ 42-45 (other-crimes

evidence properly admitted under section 115-7.4, where the prior acts were proximate in time and factually similar to the charged offense and the trial court balanced the probative value against the prejudicial effect).

¶ 45    Specifically, the State's motion alleged that defendant had committed three prior acts of domestic violence towards Salina within a few months of the March 23, 2018, incident, and two of the incidents involved defendant choking Salina. In support of its motion, the State additionally submitted the testimony of Salina's friend Hill, who testified that in February 2018 she witnessed defendant choke and "[s]lam***" Salina.

¶ 46    The court granted the motion as to two incidents, occurring in late December 2017 or early January 2018 and in February 2018, respectively, as both involved defendant choking Salina and using other force against her, just as he was charged with doing in the offense on March 23, 2018. Due to their factual similarity and proximity in time to the charged offense, the court found that their probative value was not substantially outweighed by their prejudicial effect. As these incidents occurred shortly before the offense, and all involved defendant choking Salina, the trial court did not abuse its discretion in admitting them at trial. See *People v. Donoho*, 204 Ill. 2d 159, 184-85 (2003) (trial court did not abuse its discretion in permitting evidence of another crime that occurred 12 to 15 years prior to the offense at issue, where the prior and present crimes both involved sexual conduct against children within the same age range). Any slight differences between the prior offenses and the current charge did not defeat the admissibility of the prior offenses, as "no two independent crimes are identical." See *id.* at 185.

¶ 47    Defendant nevertheless argues that the other-crimes evidence was "speculative" and not relevant to his guilt of the underlying offense where the prior incidents involved different causes

and more severe conduct, and therefore, the probative value was substantially outweighed by the prejudicial effect. At trial, however, defendant denied ever using force against Salina and testified she scratched him and pursued him as he attempted to flee from their confrontation. Evidence that defendant had a history of using force against Salina was relevant to show defendant's propensity to use force against Salina and intent to harm her, despite his testimony that he was attempting to escape her. See *Jenk*, 2016 IL App (1st) 143177, ¶¶ 37-39 (in a domestic violence case, the trial court properly found evidence of prior acts of domestic violence was relevant to show motive, intent, absence of mistake, "continued hostility" towards the victim, and propensity to commit domestic violence, particularly where offenses of domestic violence are "secretive and recurring crime[s] that could be difficult to prove").

¶ 48    To the extent defendant submits that Salina's other-crimes testimony was not corroborated and therefore "highly speculative and highly prejudicial," he essentially asks that this court examine the credibility of Salina's testimony regarding the acts, suggesting her testimony alone did not show that the acts occurred. However, it was the role of the trial court as trier of fact to determine Salina's credibility, and we will not substitute our judgment for that of the trier of fact. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). We also note that in moving to admit the evidence of defendant's prior acts, the State did corroborate Salina's testimony by presenting Hill's testimony that she saw defendant choke Salina in February 2018. Moreover, we have previously held that the trial court "should carefully limit the details" of the prior acts to "what is necessary to illuminate the issue for which the other crime was introduced," so that the proceedings do not "devolve into a minitrial on the uncharged offense." (Internal quotation marks omitted.) *People v. Davis*, 2019 IL App (1st) 160408, ¶ 67, *modified on denial of reh'g*. Detailed, corroborating trial

evidence regarding defendant's prior acts of domestic violence would have risked making those prior acts the "focal point of the trial." *People v. Bedoya*, 325 Ill. App. 3d 926 (2001). Based on the foregoing, we conclude that the trial court did not err in allowing the State to introduce evidence regarding two prior acts of domestic violence.

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 50    Affirmed.